<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| **CITY UTILITIES OF SPRINGFIELD, MISSOURI BY AND THROUGH THE BOARD OF PUBLIC UTILITIES,** ) ) ) ) ) | |
| *Petitioner,* ) ) | **Case No. 24-1200** |
| **v.** ) ) | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,** ) ) ) ) ) ) ) | |
| *Respondents.* | |

**MOTION OF ALTAMAHA RIVERKEEPER, CHATTAHOOCHEE
RIVERKEEPER, CLEAN POWER LAKE COUNTY, COOSA RIVER
BASIN INITIATIVE, HOOSIER ENVIRONMENTAL COUNCIL, JUST
TRANSITION NORTHWEST INDIANA, SIERRA CLUB, AND
WATERKEEPER ALLIANCE FOR LEAVE TO INTERVENE ON
BEHALF OF RESPONDENTS**

Pursuant to Federal Rules of Appellate Procedure 15(d) and 27, and Rule

15(b) and 27 of this Court, Altamaha Riverkeeper, Chattahoochee Riverkeeper,

Clean Power Lake County, Coosa River Basin Initiative, Hoosier Environmental

Council, Just Transition Northwest Indiana, Sierra Club, and Waterkeeper Alliance

(collectively, "Environmental Groups") hereby respectfully move to intervene in

support of Respondents United States Environmental Protection Agency ("EPA") and Michael S. Regan, EPA Administrator, in the above-captioned proceeding and with respect to any other petitions for review of EPA's May 8, 2024 regulation entitled "Disposal of Coal Combustion Residuals From Electric Utilities; Legacy CCR Surface Impoundments" ("Legacy CCR Rule"), 89 Fed. Reg. 38,950 (May 8, 2024).  Counsel for Petitioner City Utilities of Springfield, Missouri states that they take no position on the motion. Counsel for Respondent EPA states that they also take no position on the motion.

Environmental Groups and their members are directly harmed by the unsafe disposal of coal combustion residuals ("CCR") at a number of facilities that are subject to the monitoring and remediation requirements of the Legacy CCR Rule. Environmental Groups have been advocating for years for EPA to address harms from coal ash dumps that were exempted from regulation prior to the promulgation of this Rule.  As groups with members who are personally harmed by pollution from newly regulated disposal areas, Environmental Groups bring a unique perspective to this matter, and their interests are not adequately represented by existing parties.

**BACKGROUND**

## I.   DAMAGE TO HUMAN HEALTH AND THE ENVIRONMENT FROM COAL ASH DISPOSAL

When power plants burn coal to generate electricity, much of the coal is converted into gases routed to smokestacks, but a significant portion remains as larger particles called coal combustion residuals, or coal ash.  Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities, 80 Fed. Reg. 21,302, 21,303 (Apr. 17, 2015) ("2015 Rule" or "2015 CCR Rule"); *see also Util. Solid Waste Activities Grp. v. Env't Prot. Agency* ("USWAG v. EPA"), 901 F.3d 414 (D.C. Cir. 2018).  For decades, the prevailing practice in the electric industry was to dispose of coal ash in unlined surface impoundments and landfills.  80 Fed. Reg. at 21,324.  Power plants used water to convey coal ash to impoundments – effectively, giant holes in the ground – where the mixture of coal ash waste and water accumulated, with no liner to prevent additional water from infiltrating the waste, or to prevent the mixture of coal ash waste and water from leaking out of the impoundment and contaminating adjacent groundwater and surface waters.  *See id* at 21,325.  In addition, many existing impoundments were neither constructed nor maintained by qualified engineers.  Not surprisingly, at the time of its first coal ash rulemaking in 2015, EPA found that the structural stability of more than twenty-five percent of existing impoundments was poor or could not be determined.  *Id*. at 21,315.

Coal naturally contains heavy metals and metal compounds such as arsenic, boron, cadmium, chromium, lead, mercury, selenium, and thallium. *USWAG v. EPA*, 901 F.3d at 421 (citing 80 Fed. Reg. at 21,449). These metals are concentrated in coal ash, which coal-burning power plants produce in staggering quantities. Even as an increasing number of such plants retire, an urgent need to address years of improper and unsafe disposal of coal ash remains.

The severe risks of this reckless approach to the disposal of toxic coal ash waste were made clear when an impoundment at the Tennessee Valley Authority's Kingston Fossil Plant in Harriman, Tennessee failed catastrophically in 2008, sending more than one billion gallons of coal ash slurry crashing into homes, waterways, and the surrounding environment. 80 Fed. Reg. at 21,457 n.219. Since the Kingston disaster, other high-profile disasters have occurred, such as the spill of over 30,000 tons of coal ash and 27 million gallons of wastewater into the Dan River in North Carolina in 2014. Joint Factual Statement at 2, *United States v. Duke Energy Bus. Servs. LLC*, No. 5:15-CR-62-H (E.D.N.C. May 14, 2015), ECF No. 56.

The improper disposal of coal ash has wrought damage in other ways. Coal ash blows onto nearby properties, coating homes in toxic dust and forcing residents to breathe dangerous coal ash dust. *See* 80 Fed. Reg. at 21,386. At scores of sites, toxins in coal ash have leaked out of unlined landfills and impoundments and into

the groundwater that people drink and into surface water, such as rivers, streams, seas, and estuaries.  Hazardous and Solid Waste Management System; Identification and Listing of Special Wastes; Disposal of Coal Combustion Residuals From Electric Utilities, 75 Fed. Reg. 35,128, 35,204, 35,234-39 (June 21, 2010).  The chemicals in coal ash increase cancer risk and can cause other adverse health impacts including neurological, cardiovascular, and gastrointestinal problems. 80 Fed. Reg. at 21,450.  Selenium in coal ash has poisoned dozens of aquatic environments and killed or impaired fish, amphibians, and the wildlife that feed on them.  Because it bioaccumulates, selenium's damage is long-lasting and often lethal.  *Id.* at 21,363, 21,450.

## II.    THE 2015 COAL ASH RULE AND ITS IMPLEMENTATION

In response to the overwhelming evidence that unsafe coal ash disposal poses serious risks to human health and the environment, EPA first promulgated national CCR regulations in 2015.  80 Fed. Reg. at 21,302.  The 2015 CCR Rule was long overdue; EPA adopted it only after a federal court ordered EPA to comply with its obligations under the Resource Conservation and Recovery Act ("RCRA") to regulate coal ash as a solid waste.  *See Appalachian Voices v. McCarthy*, 989 F. Supp. 2d 30 (D.D.C. 2013).  At the time that EPA issued the 2015 Rule, many states had few or no requirements for the safe disposal of coal ash, and those that did exist were often inadequate and unenforced.

5

The 2015 Rule established national minimum health and safety criteria for coal ash disposal units, including: location restrictions; design and operating criteria; groundwater monitoring, corrective action, closure, and post-closure requirements; and recordkeeping, notification, and disclosure obligations.  80 Fed. Reg. at 21,302 (codified at 40 C.F.R. Pt. 257, Subpt. D).  Among other provisions, the 2015 Rule required that unlined coal ash impoundments initiate closure or retrofit within six months of determining that groundwater pollution is present at statistically significant levels above groundwater protection standards.  *Id.* at 21,418.  It further required that all impoundments – lined or unlined – initiate closure within six months if their owners or operators do not demonstrate that their bases lie at least five feet above the uppermost aquifer.  *Id*. at 21,361.

## III.    LITIGATION OVER THE 2015 RULE AND COAL ASH IT EXEMPTED FROM REGULATION

Multiple parties petitioned this Court for review of the 2015 CCR Rule, including a coalition of environmental groups that included several of the present movants and groups representing industry.  On August 20, 2018, this Court issued its decision, which held (*inter alia*), as environmental group petitioners asserted, that the 2015 Rule failed to guarantee "no reasonable probability of adverse effects on health or the environment" as required by RCRA section 4004(a), when it did not extend the rule's safeguards to inactive CCR impoundments at inactive power

6

plants, known as "legacy ponds." 42 U.S.C. § 6944(a); *USWAG*, 901 F.3d at 422, 449.  The Court partially vacated the 2015 Rule, on this and other grounds, and remanded the rule back to EPA.  *Id.* at 426–34.  The 2015 Rule also did not regulate inactive landfills, i.e., CCR landfills that stopped receiving waste before the Rule's effective date, but this omission was not raised in the *USWAG* litigation.

On August 25, 2022, environmental organizations including several of the present movants filed a complaint with the U.S. District Court of the District of Columbia seeking to compel EPA to fulfill its duty under RCRA to review its regulations at least every three years and revise them as necessary to protect human health and the environment from unsafe waste disposal in inactive CCR landfills. Compl. ¶ 1, *Statewide Organizing for Community eMpowerment v. U.S. Env't Prot. Agency,* No. 1:22-cv-2562-JDB (D.D.C. Aug. 25, 2022) (citing 42 U.S.C. § 6912(b)).  Specifically, the complainants alleged that the 2015 Rule's exemption from regulation of inactive CCR landfills was no longer proper, as data collected from hundreds of coal ash dumps since the rule's promulgation showed widespread groundwater contamination, including from landfills.  *Id.* ¶¶ 41–47.  Following negotiations between the parties, on May 3, 2023, the court granted the parties' motion for entry of a consent decree in which EPA agreed to review the 2015 Rule's exemption for inactive landfills, determine whether action is warranted by May 5, 2023, and take final action on any proposed revisions by May 6, 2024.

Consent Decree, *Statewide Organizing for Community eMpowerment v. U.S. Env't Prot. Agency,* No. 1:22-cv-2562-JDB (D.D.C. May 3, 2023).

## IV.     THE 2024 LEGACY CCR RULE

On May 8, 2024, EPA published the Legacy CCR Rule, which, among other things, applies regulatory safeguards to the previously exempted legacy ponds and inactive landfills at issue in the litigation described above.  89 Fed. Reg. 38,950.[1] Addressing the deficiencies with the exemptions identified in the *USWAG* case and 2022 complaint, EPA noted that the risks from legacy ponds and inactive landfills are "at least as significant" as the substantial public health and environmental risks posed by unlined surface impoundments and landfills already regulated by the 2015 Rule.  89 Fed. Reg. at 38,951, 39,046.  To address these risks, the Legacy CCR Rule extends existing closure requirements for unlined surface impoundments to legacy ponds and establishes safeguards that apply to coal combustion residual management units ("CCRMU"), a category that includes inactive CCR landfills and other areas where coal ash has been managed directly on the land.  *Id.* at 38,951.

---

[1] Publication of the final rule followed issuance of a proposed rule and a comment period in which Environmental Groups and industry parties participated. Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals from Electric Utilities; Legacy Surface Impoundments, Docket ID EPA-HQ-OLEM-2020-0107 (May 17, 2023).

## ARGUMENT

Under Federal Rule of Appellate Procedure 15(d), a motion to intervene need contain only "a concise statement of the interest of the moving party and the grounds for intervention."  Fed. R. App. P. 15(d); *see Synovus Fin. Corp. v. Bd. of Governors of the Fed. Reserve Sys.*, 952 F.2d 426, 433 (D.C. Cir. 1991).  As explained below and shown by the attached declarations, Petitioner challenges the Legacy CCR Rule, a rule addresses the environmental and health impacts of unsafe CCR disposal that harm the interests of Environmental Groups and their members.  Environmental Groups have a strong interest in the expedient and effective mitigation of these threats, which Petitioner now seeks to undermine and delay.

## I.    ENVIRONMENTAL GROUPS' STATEMENT OF INTEREST AND GROUNDS

The Environmental Groups' members live, work, and recreate in areas where decades of unsafe disposal of coal ash have harmed, and continue to harm, their health, their enjoyment of their property, and their ability to recreate safely.  In particular, members have been and continue to be impacted by coal ash dumps that were exempted from federal regulatory requirements prior to the adoption of the Legacy CCR Rule.  *See* Declarations of Andrea Goolsby, Matt Robinson, Dulce Ortiz, Tom Harbin, Ruth Turner, Paul Kysel, Jennifer Conner, and Dean Naujoks.

9

Andrea Goolsby has been a member of Altamaha Riverkeeper in Georgia since 2019. Goolsby Decl. ¶ 2. She currently lives in Forsyth about eight to nine miles from the Scherer Power Plant, a coal-fired power plant in Juliette, Georgia. *Id*. ¶ 3. Prior to that she lived for twenty-four years in Juliette, where her parents and sisters still live. *Id.* ¶ 4. Ms. Goolsby's fourteen-year-old son spends five to six days per week at her parents' house where they all drink bottled water because coal ash has contaminated the groundwater that serves their drinking wells. *Id*. ¶¶ 5–6. Ms. Goolsby also spends significant time recreating in Lake Juliette and the Ocmulgee River, both of which are near the Scherer Plant. She worries that Plant Scherer's unsafe handling of coal ash has contributed to her son's developmental issues and to the liver cancer that killed her grandfather. *Id*. ¶¶ 6, 10. She also worries that if the coal ash pollution from Plant Scherer is not addressed, there will be further environmental degradation in the area, including further contamination of groundwater that will harm her and her family. *Id*. ¶ 11.

Matt Robinson has been a member of Chattahoochee Riverkeeper for about twelve years. Robinson Decl. ¶ 2. Mr. Robinson owns a business that provides guided fishing trips on the Chattahoochee River and wildlife tours. *Id*. ¶¶ 3–4, 7. His fishing trips operate in the vicinity of Plant McDonough and Plant Yates, two sites with coal ash pollution issues. *Id*. ¶¶ 4–5. Mr. Robinson worries that unsafe coal ash disposal is jeopardizing the Chattahoochee's ecosystem. If this continues,

he worries that it will put his business at risk as people will no longer want to fish or view wildlife on the Chattahoochee. *Id*. ¶¶ 6–7.

Dulce Ortiz, a member of Clean Power Lake County and mother of three children, is a thirty-year resident of Waukegan, Illinois who lived 1.5 miles from the Waukegan Generating Station, a coal-fired power plant next to Lake Michigan, for eleven years. Ortiz Decl. ¶¶ 2–3. Although the plant stopped generating electricity in 2022, significant amounts of coal ash remain on site, including coal ash that is only now regulated by the Legacy CCR Rule, and groundwater contamination has been detected. *Id*. ¶¶ 6–7. Ms. Ortiz is concerned about the harms of this coal ash to her family and her community. She does not allow her children to swim at the beach nearest the coal ash and is concerned for the well-being of people she sees fishing near the plant. *Id.* ¶¶ 10–11. For years, Ms. Ortiz has been urging local, state, and federal officials to require the prompt and effective cleanup of coal ash at the Waukegan plant. *Id*. ¶ 4.

Tom Harbin has been a member of the Coosa River Basin Initiative for the past five years. He and his family own a working farm with a mile and a half of frontage on the Coosa River near Plant Hammond. Harbin Decl. ¶¶ 2–4. Mr. Harbin is concerned about coal ash at Plant Hammond, which is unsafely disposed of alongside the Coosa River and sits in contact with groundwater. *Id*. ¶ 5. There is a slough, or wetland, from the Coosa River that backs up onto ten acres of his

11

property. *Id.* ¶ 6. In addition, Mr. Harbin fishes, swims, and boats in and on the river. *Id.* Plant Hammond's storage of coal ash in in contact with groundwater has threatened his health and the value of his property and will continue to do so if Georgia Power, the plant owner, is not required to take effective measures. *Id.* ¶¶ 6, 8–9.

Ruth Turner lives in Jefferson County, Indiana, about ten miles downriver from the Clifty Creek power plant in Madison, Indiana. Turner Decl. ¶ 3. She is currently a member of Hoosier Environmental Council and has been so on and off since the 1990s. *Id.* ¶ 2. She and other community members worry that the coal ash at Clifty Creek is polluting the river, contaminating the fish that people catch in the river and eat, and contributing to bad health outcomes in the area. *Id.* at ¶¶ 4–5. Because of her concerns, Ms. Turner avoids boating near the Clifty Creek station and worries that a new trail opening along the river will expose her and others who use it to harmful pollution. *Id.* ¶¶ 5–6. Ms. Turner is aware that the Legacy CCR Rule will require coal ash cleanup at Clifty Creek and fears the consequences should coal ash not be cleaned up at the plant. *Id.* ¶ 8.

Paul Kysel and his wife Kristine Kysel are both members of Just Transition Northwest Indiana and live in Pines Township, Indiana, a few miles from the Michigan City Generating Station. Kysel Decl. ¶ 2. Kristine grew up in Michigan City and, with Paul, lived approximately a quarter of a mile from the plant for five

years.  *Id*.  The Kysels love the outdoors and in particular fossil hunting on Lake Michigan's beaches.  *Id*. ¶ 5.  They are concerned that decades of living in coal ash contaminated areas have jeopardized their health and that of their family and neighbors.  *Id*. ¶ 7.  They are also concerned about the catastrophic potential of the tons of coal ash at the Michigan City Generating Station, prevented only by a decaying steel wall from spilling into Lake Michigan and an adjacent creek.  *Id*. ¶ 6.  Previously exempted, this coal ash will need to be remediated under the 2024 Rule.  *Id*. ¶ 8.

Jennifer Conner joined the Sierra Club in 2012 and became a lifetime member in 2019.  Conner Decl. ¶ 2.  She lives in Pierce City, Missouri about forty miles southwest of the John Twitty Energy Center, a coal-burning power plant owned and operated by the Petitioner, City Utilities of Springfield, Missouri.  *Id*. ¶ 3.  Ms. Conner's drinking and household water is drawn from the Ozark Aquifer, which underlies the Springfield Aquifer and is separated from it by highly permeable limestone.  *Id*. ¶¶ 4–5.  The Twitty Plant is sited above the Springfield Aquifer and Ms. Conner worries that groundwater contamination from Twitty's coal ash is migrating into the Springfield Aquifer and then the Ozark Aquifer.  *Id*. ¶¶ 4–6.  She and her family also kayak in the James River, which is downriver from areas where coal ash pollutants have been detected.  *Id*. ¶¶ 6–7.  Ms. Conner worries about her family's exposure to harmful coal ash constituents from their

drinking water and from kayaking, as well as the harms of coal ash on the plants and animals in the area. *Id*. ¶¶ 9–10. She worries that if City Utilities' petition is successful, coal ash contamination will continue. *Id*. ¶ 11.

Dean Najouks is the Potomac Riverkeeper and a member of the Waterkeeper Alliance. Najouks Decl. ¶ 2. Mr. Najouks works to protect the quality of the water in the Potomac River watershed. *Id*. ¶ 4. Through his work on the Potomac, and prior to that on rivers in North Carolina, he is aware of the significant harms that coal ash contamination can cause. *Id*. ¶ 6. Mr. Najouks regularly meets with Riverkeeper members who have been harmed by unsafe coal ash disposal. Many members near coal ash have significant health problems, such as infertility and cancer. *Id*. ¶ 8. Several coal ash sites sit along the Potomac River and leak into groundwater and nearby surface waters. *Id*. ¶ 10. Mr. Naujoks views the 2024 rule as critical to fully cleaning up these sites. *Id*. ¶ 11.

Furthermore, the organizational purposes of Altamaha Riverkeeper, Chattahoochee Riverkeeper, Clean Power Lake County, Coosa River Basin Initiative, Hoosier Environmental Council, Just Transition Northwest Indiana, Sierra Club, and Waterkeeper Alliance include minimizing and preventing the public health and environmental risks from toxic coal ash. *See* Declarations of Fletcher Sams, Jason Ulseth, Celeste Flores, Jesse Demonbruen-Chapman, David Van Gilder, Ashley Williams, Jonathan Levenshus, and Daniel Estrin.

Environmental Groups seek to intervene to oppose any attempts by Petitioners to undermine or delay EPA's efforts to ensure effective remediation of environmental and health threats from coal ash newly regulated by the Legacy CCR Rule.  As noted above, numerous sites containing such coal ash directly threaten the interests of Environmental Groups and the health and environment of their members, who have been engaged for some time in efforts to address these threats.

For the foregoing reasons, Environmental Groups have an "interest" in this matter within the meaning of Federal Rule of Appellate Procedure 15(d). Furthermore, Environmental Groups satisfy the requirements of Article III and prudential standing (should such a demonstration be necessary for parties who, as here, seek to intervene in support of respondents[2]).  *See, e.g.*, *Friends of the Earth*

---

[2] *See, e.g.*, *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1232 (D.C. Cir. 2018) ("[A]ll would-be intervenors must demonstrate Article III standing."); *Ctr. for Biological Diversity v. Regan*, 539 F. Supp. 3d 136, 140 (D.D.C. 2021); *Deutsche Bank Nat'l Trust Co. v. Fed. Deposit Ins. Corp.*, 717 F.3d 189, 193–94 (D.C. Cir. 2013); *Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013).  *But see Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 (2020) (finding that the Third Circuit erred by inquiring into Movant's independent Article III standing where another party had already demonstrated standing for the same claim of relief sought); *Bond v. United States*, 564 U.S. 211, 217 (2011) (Article III requirements apply to those "who seek[] to initiate or continue proceedings in federal court," not to those who defend against such proceedings); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 233 (2003) (where the position of the respondent-intervenors is identical to that of the agency and the agency's standing is unquestionable, no separate inquiry regarding intervenor standing is necessary), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876 (2010).

*v. Laidlaw Env't Servs.*, 528 U.S. 167, 183–84 (2000) (environmental group has standing to enforce pollution limits where members have reasonable concerns about adverse effects of pollution in the areas they use); *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 317 (D.C. Cir. 2015) (an intervenor seeking to support agency action establishes standing "where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit."); *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 4–7 (D.C. Cir. 2005) (conservation groups with members in affected area have standing to challenge action that would facilitate increased air pollution in area); *Sierra Club v. EPA*, 129 F.3d 137, 139 (D.C. Cir. 1997) (environmental group with members in affected areas has standing to challenge weakening of Clean Air Act requirements for such areas).

## II.    ENVIRONMENTAL GROUPS' INTERVENTION IS WARRANTED

Environmental Groups' interests would not be adequately represented in the absence of intervention. *Cf. Dimond v. District of Columbia*, 792 F.2d 179, 192–94 (D.C. Cir. 1986). Without Environmental Groups' intervention, the Court will hear only EPA's arguments in response to Petitioners. This Court "ha[s] often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C.

Cir. 2003); *see also Natural Res. Def. Council v. Costle*, 561 F.2d 904, 912–13

(D.C. Cir. 1977).[3]

That is especially true here.  Environmental Groups have at times found

themselves in disagreement with EPA over which coal ash disposal sites should be

closed and remediated, how quickly this should happen, and what level of

remediation should be required.  Environmental Groups have urged EPA for years

to take action to address the risks of unsafe disposal of coal ash, including coal ash

exempted from regulation by the 2015 CCR Rule.  As part of this advocacy,

Environmental Groups publicly testified and submitted written comments

critiquing the proposed Legacy CCR Rule.  *See e.g.,* U.S. EPA, Chicago Public

Hearing Transcript – Condensed Format, EPA-HQ-OLEM-2020-0107-0376 (July

26, 2023)..  EPA's interpretation of the factual and legal issues in this case may

differ from Environmental Groups' interpretation, as it has in the past.  Sierra Club

and other environmental organizations filed a successful lawsuit against EPA to set

---

[3] This Court permitted two of the Environmental Groups, Hoosier Environmental
Council and Sierra Club, to intervene in support of EPA in previous litigation
where a petitioner sought to weaken the Coal Ash Rule.  *USWAG v. EPA*, 901 F.3d
414 (D.C. Cir. 2018).  This Court also permitted a number of the Environmental
Groups, including Altamaha Riverkeeper, Chattahoochee Riverkeeper, Coosa
River Basin Initiative, Hoosier Environmental Council, and Sierra Club to
intervene in support of EPA in an industry effort to undermine implementation of
the Coal Ash Rule.  *Electric Energy, et. al. v. EPA*, 2024 WL 3211589 (D.C. Cir.
2024).

a deadline for issuance of the CCR Rule.[4]  Several of the Environmental Groups

filed litigation challenging certain provisions of the 2015 Rule as unlawfully weak,

including the Rule's failure to address risks from legacy ponds, *see USWAG v.*

*EPA*.  Several of the Environmental Groups also filed a complaint alleging that

RCRA compels EPA to address the risks from inactive landfills, which led to the

aforementioned consent decree and, in part, to the Legacy CCR Rule.  Consent

Decree, *Statewide Organizing for Community eMpowerment v. U.S. Env't Prot.*

*Agency*, No. 1:22-cv-2562-JDB (D.D.C. May 3, 2023).  For these reasons,

Environmental Groups cannot rely on EPA to make all the arguments that they

believe should be advanced to protect their and their members' interests.

Furthermore, Environmental Groups respectfully submit that their views on

the arguments advanced by Petitioner will be of assistance to the Court.  A party

seeking to intervene "may also be likely to serve as a vigorous and helpful

supplement to EPA's defense."  *Natural Res. Def. Council*, 561 F.2d at 912–13.

Environmental Groups, with members living and working in the areas polluted by

coal ash or at risk of contamination from coal ash at issue in this matter, offer a

perspective different from the one EPA is likely to provide.

---

[4] *Appalachian Voices v. McCarthy*, 989 F. Supp. 2d 30 (D.D.C. 2013);
*Appalachian Voices v. McCarthy*, 38 F. Supp. 3d 52 (D.D.C. 2014).

18

Environmental Groups' participation as intervenors in support of EPA will not delay the proceedings or prejudice any party.  This motion to intervene is timely filed within the thirty-day period allowed under Federal Rule of Appellate Procedure 15(d).  Environmental Groups intend to file briefs and other submissions jointly, as directed by D.C. Circuit Rule 28(d)(4), so their participation will be conducted efficiently.  The Court has not yet established a schedule for merits briefing or oral argument.  As a result, Environmental Groups' participation will not undermine the efficient and timely adjudication of this case.

## CONCLUSION

In sum, Environmental Groups meet the requirements for intervention.  The organizations and their members have interests relating to the subject matter of this action and legitimate grounds for seeking to participate in the case.  This motion is also timely filed and granting it will not delay the proceedings or prejudice any party.  Accordingly, Environmental Groups respectfully request leave to intervene in Case No. 24-1200 and in any other cases that may be consolidated with this proceeding in the future.

Dated: July 15, 2024                         Respectfully submitted,

*/s/ Gavin Kearney*                         Nicholas S. Torrey
Gavin Kearney                               Southern Environmental Law Center
Thomas Cmar                                 601 West Rosemary St., Ste. 220
Jenny Cassel                                Chapel Hill, NC 27516

19

Earthjustice
311 South Wacker Dr., Ste. 1400
Chicago, IL 60606
(215) 717-4520
gkearney@earthjustice.org
tcmar@earthjustice.org
jcassel@earthjustice.org

Gilbert Zelaya
Earthjustice
48 Wall St., 15th Fl.
New York, NY 10005
(212) 845-7393
gzelaya@earthjustice.org

(919) 967-1450
ntorrey@selcnc.org

Frank S. Holleman, III
Southern Environmental Law Center
525 East Bay St., Ste. 200
Charleston, SC 29403
(843) 720-5270
fholleman@selcsc.org

*Counsel for Movants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 27 and 32(g)(1), the undersigned counsel for Movants certifies that this motion complies (1) with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) and D.C. Circuit Rule 27(a)(2) because it contains 4,399 words and (2) with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)–(6) because it has been prepared using Microsoft Office Word for Office 365 and is set in Times New Roman font in a size equivalent to 14 points or larger.

Dated: July 15, 2024

/s/ Gavin Kearney
Gavin Kearney

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure and D.C. Circuit Rule 26.1, Movant-Intervenors Altamaha Riverkeeper, Chattahoochee Riverkeeper, Clean Power Lake County, Coosa River Basin Initiative, Hoosier Environmental Council, Just Transition Northwest Indiana, Sierra Club, and Waterkeeper Alliance state that they are non-profit advocacy organizations dedicated to the protection of public health and the environment. They have no outstanding shares or debt securities in the hands of the public, nor any parent, subsidiary, or affiliate that has issued shares or debt securities to the public.

/s/ Gavin Kearney
Gavin Kearney

## CERTIFICATE OF PARTIES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A), I certify that the parties, intervenors, and amici in these consolidated cases are:

<u>Petitioners:</u> City Utilities of Springfield, Missouri by and through the Board of Public Utilities.

<u>Respondents</u>: United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency.

<u>Movant-Intervenor in Support of Petitioners</u>: There are no Movant-Intervenors in support of Petitioners at the time of filing.

<u>Movant-Intervenors in Support of Respondent</u>: Altamaha Riverkeeper, Chattahoochee Riverkeeper, Clean Power Lake County, Coosa River Basin Initiative, Hoosier Environmental Council, Just Transition Northwest Indiana, Sierra Club, and Waterkeeper Alliance.

<u>Amici</u>: There are no amici curiae at the time of filing.

Dated: July 15, 2024

/s/ Gavin Kearney
Gavin Kearney

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of July, 2024, I served the foregoing Motion of Altamaha Riverkeeper, Chattahoochee Riverkeeper, Clean Power Lake County, Coosa River Basin Initiative, Hoosier Environmental Council, Just Transition Northwest Indiana, Sierra Club, and Waterkeeper Alliance For Leave to Intervene on Behalf of Respondents on all registered counsel through the Court's electronic filing system.

/s/ Gavin Kearney
Gavin Kearney

ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| **City Utilities of Springfield, Missouri by and through the Board of Public Utilities,** | ) ) ) ) | |
| *Petitioner,* | ) ) | |
| **v.** | ) ) | **Case No. 24-1200** |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,** | ) ) ) ) ) | |
| *Respondents.* | | |

## STANDING DECLARATIONS ADDENDUM

## **TABLE OF CONTENTS**

**DECLARATIONS**                                                                                        **PAGE**

Andrea Goolsby ..............................................................................ADD001

Matt Robinson ............................................................................... ADD003

Dulce Ortiz................................................................................... ADD005

Tom Harbin .................................................................................ADD011

Ruth Turner................................................................................. ADD013

Paul Kysel .................................................................................. ADD017

Jennifer Conner .............................................................................ADD022

Dean Naujoks................................................................................ ADD026

Fletcher Sams ............................................................................... ADD032

Jason Ulseth ................................................................................ADD034

Celeste Flores............................................................................... ADD036

Jesse Demonbruen-Chapman .............................................................. ADD044

David Van Gilder ............................................................................ADD047

Ashley Williams ............................................................................ ADD055

Jonathan Levenshus ......................................................................... ADD062

Daniel E. Estrin............................................................................. ADD068

## DECLARATION OF ANDREA GOOLSBY

1.     My name is Andrea Goolsby. I am over the age of 18. This declaration represents my personal knowledge and beliefs.

2.     I am a member of the Altamaha Riverkeeper. I joined the Riverkeeper in November of 2019. The Altamaha Riverkeeper fully and adequately represents my interests in this matter.

3.     I live near Forsyth, about eight or nine miles from Plant Scherer. I have lived here for 13 years.

4.     Before that, I lived in Juliette for 24 years. My family still lives in the community. My parents live three or four miles from the plant. My two sisters live three to five miles from the plant. My grandmother lived on Luther Smith Road, very close to the ash pond.

5.     My son is 14 years old. He lives at my parents' house in Juliette five to six days per week, and I visit there all the time. Their house is on well water.

6.     I do not drink the water at my parents' house because of my concerns that it is contaminated with coal ash pollution, due to how close the well is to the ash pond at Plant Scherer. My parents buy bottled water because of the water pollution issue, but I am still concerned about my son consuming well water there because they do use it for making him kool-aid sometimes. And he consumed the well water as an infant. He has some developmental issues and I will never know if it is related.

7.     I kayak and fish on Lake Juliette, and a lot of my family and friends do too. I am out on the lake about six days a month, year round, fishing with my son on the weekends. I do not let my son keep fish to eat from Lake Juliette. If the water is contaminated, the fish have to be too. I have seen that some of the fish have deformations around their eyes.

8.     Plant Scherer is near the Ocmulgee River. I go kayaking on the Ocmulgee River quite often during the spring, summer, and fall. I go almost every weekend during the summer and swim in the river. I have concerns that the pollution in the river could affect my health when I swim there.

9.     I like to photograph wildlife at the river, especially an eagle I like to observe. And my son hunts doves and duck in the area—I hunt doves with him occasionally. I worry about the coal ash pollution affecting the wildlife.

10.     I am aware that the coal ash at Plant Scherer is submerged in the groundwater. I know that coal ash pollution leaches out into groundwater and into surface waters. A creek flowing under Luther Smith Road at my grandmother's house had visible contamination. And the sink in her house would also have thick brown residue build up if it was left dripping. My grandfather passed away from a rare bile duct liver cancer. Animals would be born deformed there, trees would die—a lot of not normal environmental things had been happening there for many years. We have been concerned for a long time that it was due to pollution from Plant Scherer.

11.    If the coal ash is left in place according to Georgia Power's current closure plan, it will still be in the groundwater and continue to leach pollutants into the environment. I am also worried about wet ash spilling out of the impoundment. That would devastate this community. I have lots of family in the area so that would be catastrophic.

12.    Moving the ash to lined storage would help address my concerns, because you have got to stop adding more pollution to the environment before you can clean it up. The people who live in this area should not be responsible for this mess—Georgia Power should take responsibility for cleaning it up.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on _July 10_, 2024.

_____

Andrea Goolsby

# DECLARATION OF MATT ROBINSON

1.      My name is Matt Robinson. I am over the age of 18. This declaration represents my personal knowledge and beliefs.

2.      I am a member of Chattahoochee Riverkeeper. I have been a member for about twelve years. I use my boat to participate in cleanups along the Chattahoochee River on weekends, which I have done for the last ten or so years. Chattahoochee Riverkeeper fully and adequately represents my interests in this matter.

3.      I have lived in East Point, Georgia for about 21 years. For the past 17 years or so, I have been a river fishing guide. Since last year I have run my guide business full-time.

4.      My guide business operates mainly on the Chattahoochee River from the vicinity of Plant McDonough south to Columbus, Georgia. I regularly lead trips on the river near and downstream of Plant McDonough. I also work further south, downstream of Plant Yates. In fact, I am headed down to Whitesburg near Plant Yates in the next few days to scout the fish before taking clients on a guided trip. We fish mainly for striped bass, as well as other species like largemouth bass and catfish. And the kids always like catching longnose gar. Bait fish that attract these species like to congregate near the mouths of tributary streams that flow into the river.

5.      I am aware of the coal ash pollution issues at Plant McDonough and Plant Yates. The ash leaches pollutants into the groundwater, which flows into nearby streams and the Chattahoochee River. I know that the groundwater levels fluctuate over time. If the ash is capped while remaining in contact with the groundwater, it can continue to pollute the environment after the ash is covered.

6.      My main concern is the safety of the ecosystem because everything starts at the bottom: plankton and algae feed the smaller fish, which feed the larger fish I am targeting for my clients. If there is a pollution impact it will spread through the ecosystem, and I would have to find somewhere else to fish. Continuing coal ash pollution puts my business at risk by adding metals and other pollutants that can accumulate in the ecosystem. If people become concerned about coal ash pollution in the river and the fish, they will not want to use my business on the river. Some of my clients want to eat the fish they catch, and if the river became more polluted they would want to go elsewhere. Also, I know that the state of Georgia only tests the fish and issues warnings for a few pollutants, so they might not catch all the problems. If coal ash pollution built up in the river, it would harm the ecosystem and be extremely detrimental to my business, costing me tens of thousands of dollars.

7.      In addition to fishing, I also offer wildlife tours for nature lovers and wildlife photographers. Seeing interesting wildlife on the river adds value for my fishing clients as well. The other day we saw a bald eagle and an osprey, and we have seen herons and white cranes on my trips as well. Mink and muskrats live on the riverbank, including near Plant McDonough, and kids love seeing them on my trips. The muskrats eat mainly clams so they would be exposed to coal ash pollutants in the water. Coal ash pollution in the environment is a significant concern for the health of the wildlife, which puts an important attraction for my business at risk.

8.      I also kayak and fish recreationally with my family. We enjoy all these aspects of the river ourselves too, and I am personally concerned about the effect of coal ash pollution on the fish, wildlife, and river ecosystem that I enjoy.

9.      Leaving coal ash in place at Plant McDonough and Plant Yates also continues the threat of a coal ash spill indefinitely. A coal ash spill along the Chattahoochee River would drive away my clients and would be a major problem for the ecosystem. Not all species can move away from a problem, and those that could not would die. People would not want to visit this area if one of these plants had a coal ash spill.

10.     Cleaning up the coal ash at Plant McDonough and Plant Yates and moving it to dry, lined storage away from the river would address my concerns, because it would stop the coal ash pollution and remove the long-term threat.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ___July 13ᵗʰ___, 2024.

Matt Robinson

ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **CITY UTILITIES OF SPRINGFIELD, MISSOURI BY AND THROUGH THE BOARD OF PUBLIC UTILITIES,** )<br><br>) | |
| *Petitioner,* ) | |
| v. ) | **Case No. 24-1200** |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,** ) | |
| *Respondents.* | |

## DECLARATION OF DULCE ORTIZ

I, Dulce Ortiz, declare and state as follows:

1. My name is Dulce Ortiz. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2. Clean Power Lake County ("CPLC") is a community-driven coalition that aims to secure environmental, economic, and racial justice. I have been a member of Clean Power Lake County since 2013 and I have lived in Waukegan for about 30 years.

1

3. I enjoy living in Waukegan because of the diverse culture and beautiful lakefront. In addition to being a volunteer for CPLC and an active member of my community, I am the mother to three children who have grown up in Waukegan and have been impacted by coal ash pollution.

4. As a CPLC volunteer, I have met with local, state, and federal elected officials to advocate for policies and measures that will ensure that Waukegan is protected from pollution. Additionally, I am active in CPLC advocacy and community education efforts. This includes holding discussions about the coal ash issue, defending important legislation, and participating in forums with community members and elected officials to advance coal ash protections. I also seek to elevate the voices of people in my community. As a member of CPLC, I have advocated for the state and national government to act on the coal ash issue by traveling to Springfield, and D.C. to share my story. On these trips I have testified for more robust, protective standards for the cleanup and removal of coal ash. I have also been on the radio and television to share the story of Waukegan and how coal ash affects my family and me in the hopes that it will bring more attention to the need for action.

5. Waukegan is the site of the NRG Energy coal plant. After Midwest Generation went bankrupt, NRG Energy purchased it along with its coal

plants, which includes the Waukegan power plant. Before it closed a couple
of years ago, the power plant operated boilers that were over 50 years old.
Through my work at CPLC, I better understand how these coal plants and
their legacy endanger the health of all communities in Lake County,
particularly Waukegan.

6. The Waukegan plant has two coal ash ponds near Lake Michigan that are
regulated under EPA's 2015 CCR Rule. The coal ash ponds are lined with
inadequate plastic liners and groundwater monitoring reports show that coal
ash at the site is contaminating groundwater. Measures taken to address risks
from the coal ash ponds, leaving the coal ash in place and placing a cover
over it, are insufficient. This endangers the people of Lake County, as well
as our water quality and environment. I am deeply concerned about the
water and air pollution that are a result of the Waukegan plant.

7. I am also aware that there is coal ash at the Waukegan plant that is outside of
these two impoundments and has never been cleaned up. This coal ash is not
regulated by the 2015 CCR Rule and continues to contribute to groundwater
contamination. The 2024 Legacy CCR Rule requires NRG to monitor and
address contamination from this coal ash. I am concerned about the water
quality of Lake Michigan as contaminated groundwater from the NRG site
migrates toward it and as water levels in the lake rise, I also worry about the

3

unregulated ponds overflowing during heavy rainfall. This would put Lake Michigan in danger, as well as individuals who use the municipal beaches less than one mile away from the plant.

8. Many members of the community suffer from respiratory illnesses. My mother and I have both developed asthma and respiratory issues. I lived near the plant for 11 years and would run along the lakefront near it. During this time, I got sick more frequently and I was diagnosed with asthma even though I never had it before this and I do not smoke. My mother does not have medical insurance and the cost of her healthcare is expensive. Her inability to access medication worries me constantly. This is the experience of many members of the Waukegan community and worsens existing inequities.

9. Before my respiratory problems, I enjoyed running on the Lake Shore trail. Then I experienced pneumonia, bronchitis, and prolonged respiratory issues. I stopped running in the area because I believe my sicknesses are the result of air pollution from the Waukegan power plant.

10. All three of my children suffer from respiratory issues. My youngest child became sick at a very young age and had to be given nebulizer and inhaler treatments. To protect the health of my children, I moved further away from the Waukegan power plant due to the air and water pollution. Although we

4

live near Lake Michigan and my children love the beach, I don't let them go to the beach in Waukegan. Instead, we drive to beaches that are far from the NRG plant. The contamination from unregulated coal ash ponds makes us unable to swim and fish in the lake or experience the greenery near our home. If it was not for the coal ash from the Waukegan plant, my kids would use the local beach every day.

11. My experiences are shared by many in Waukegan, and as many as 1 in 3 children in Waukegan are living with asthma or symptoms of asthma. Studies have also been written about the life expectancy in Waukegan. I see people fish in Lake Michigan at Waukegan beach, and I know that many consume the fish they catch. I worry that they don't understand the risks that they are taking because of pollution from the Waukegan plant. Life expectancy in Waukegan is 14 years less than life expectancy in Lake Forest, an affluent town down the lakefront that doesn't face the same health and environmental problems. As a mother, this makes me worry about my children's health and well-being.

12. If the coal ash is not cleaned up, I fear my family's health and well-being will continue to be harmed. I worry that increasingly frequent natural disasters like severe storms and tornados will spread coal ash contamination, further polluting our air and water, and endangering public health.

5

13. The 2024 Rule will help ensure that all coal ash is safely and effectively cleaned up at the Waukegan site. This would also restore a sense of safety in the community, and the dangers of coal ash would not be always looming in the back of my head. If this cleanup happens, my family and I will be able to use our lakefront and green space and I will be able to devote more time to raising my family.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct. Executed on this 11th day of July 2024, in Waukegan, Illinois.

Dulce Ortiz

# DECLARATION OF TOM HARBIN

1.      My name is Tom Harbin. I am over the age of 18. I have personal knowledge of the matters stated herein.

2.      I am a member of the Coosa River Basin Initiative. I have been a member for about five years.

3.      I have a home in Atlanta. Together with other members of my family, I also own a farm with a mile and half of river frontage on the Coosa River, which has been in our family for over fifty years. It is located about a mile and half downstream from Plant Hammond.

4.      The land is a working farm; we grow corn, cotton, and soybeans. Our farmhouse is located right on the Coosa River. My family and I visit there approximately once a month.

5.      I am concerned that pollution is flowing out of the coal ash at Plant Hammond into the river. I'm aware that the coal ash at Plant Hammond contains metals, that the ash is located beneath the groundwater table, and I am aware that there are not any measures to prevent the metals from making their way from the ash into the river. I am aware that these metals stay in the sediment of the river and in the foodchain.

6.      The river backs up in a slough that covers about ten acres on our property, depending on the level of the river. Fish swim there from the main part of the river, and I fish there for catfish. I also fish on the Coosa River itself. I swim in the river and go boating and canoeing as well. I am concerned that eating the fish, which I do, and swimming in the water could affect my health due to the coal ash pollution.

7.      I also enjoy observing wildlife on the river, but I am concerned that coal ash pollution could harm them as well. We finally have bald eagles coming back to our family property, and they eat fish from the river. So do the osprey that we observe. I am concerned that they can be contaminated as well, because metals persist in the foodchain.

8.      I am also concerned that if Georgia Power caps its coal ash in place next to the river where it is vulnerable to flooding, there is a long-term risk of a structural failure. I am aware of what happened with the Dan River coal ash spill in North Carolina, and I certainly would not want to have a spill of coal ash into the Coosa River just upstream from my property. That would contaminate my property and hurt its value.

9.      I regularly drive by the Plant Hammond site and see them working on the coal ash ponds. I am aware that one pond has been capped and the ash in the capped pond is sitting in groundwater. I have observed them removing ash from another pond, and I am puzzled why they would not clean up all the coal ash. I believe any reasonable person can see that Georgia Power needs to clean up unlined coal ash that is effectively connected to the river through groundwater.

10.     Removing the coal ash from the unlined storage at Plant Hammond to a lined landfill is necessary to address the ongoing pollution and the continued risk posed by the ash ponds that put my property at risk and affect my enjoyment of my property and the river.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on _June 24_____, 2024.

_____

Tom Harbin

2

ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| CITY UTILITIES OF SPRINGFIELD, MISSOURI BY AND THROUGH THE BOARD OF PUBLIC UTILITIES,<br><br>       *Petitioner,*<br><br>      v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,<br><br>      *Respondents.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>    **Case No. 24-1200** |

## DECLARATION OF RUTH TURNER

I, Ruth Turner, declare and state as follows:

1. My name is Ruth Turner. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2. I am a current member of Hoosier Environmental Council ("HEC") and have been so on and off since the 1990s. I originally learned about HEC's work

1

on coal ash after seeking help from them to protect a nature reserve. This led me to get more involved and renew my membership last year. Through HEC, I have learned about environmental issues in the region and coal ash pollution in Indiana.

3. I live in Jefferson County, Indiana, about 10 miles downriver from the Clifty Creek power plant in Madison, Indiana, which I pass often. From my membership at HEC, I know that the Clifty Creek station has coal ash ponds that sit alongside the Ohio River. The coal ash produces dust and sludge, and I am concerned because it sits right next to the Ohio River. I worry that Clifty Creek coal ash is contaminating the Ohio River and harming people who live downriver from it, particularly people who source their drinking water from it.

4. Many people in the area have anxiety about the coal ash because of serious health problems, like cancer, that have been linked to the chemicals in it. A lot of people in my community worry that we're a cancer hotspot and fear the long-term impacts of the black soot from Clifty Creek that used to coat our community, and the coal ash that is still there.

5. I enjoy boating in the river but avoid doing so around the water near Clifty Creek. Likewise, I am concerned about the coal ash contamination affecting

2

wildlife, and about people eating fish sourced from the river.  Many people are already worried about carcinogenic waste in the river.

6.  There is a plan to open a recreational trail along the river from Hanover to Madison, and it is planned to pass the Clifty Creek station. I plan to use this trail but worry about how getting close to the power plant will impact my and others' health.

7.  Because the Clifty Creek plant sits right next to the Ohio River, I live with the fear that flooding will cause irreparable contamination to the river. I also worry that a breach of the coal ash dumps would do great harm to the river and to the economic well-being of the county.

8.  I am aware that the 2024 CCR Rule will require monitoring and closure of coal ash ponds at Clifty Creek. It is important that the coal ash from Clifty Creek is cleaned up and removed to protect the Ohio River and the people who rely on the river. If the coal ash is left where it is, I worry the community will continue to live in fear of disaster, and face health consequences and water contamination.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct. Executed on this day 12th of July 2024, in Lexington, Indiana.

_Ruth Turner_

Ruth Turner

4

ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| CITY UTILITIES OF SPRINGFIELD, MISSOURI BY AND THROUGH THE BOARD OF PUBLIC UTILITIES, ) ) ) ) ) | |
| *Petitioner,* ) ) | Case No. 24-1200 |
| v. ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, ) ) ) ) ) | |
| *Respondents.* | |

## DECLARATION OF PAUL KYSEL

I, Paul Kysel, declare and state as follows:

1. My name is Paul Kysel. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2. My wife Kristine and I are members of Just Transition Northwest Indiana ("JTNWI") and residents of Pines Township, Indiana. From 1985 to 1990

1

we lived about a quarter mile from the Michigan City Generating Station in Michigan City, Indiana. Kristine grew up in Michigan City. I have also been heavily involved with People in Need of Environmental Safety (PINES), a grassroots group that formed to advocate for safety from coal ash harms in the Town of Pines. I was a member of PINES for 14 years and at times served as secretary, vice president, and president until PINE ran out of funding. As a result of where we live and our involvement in these organizations, I have been dealing with the effects of unsafe coal ash dumping for four decades.

3. I originally learned about JTNWI when its Executive Director, Ashley Williams, reached out to me shortly after it was formed to better understand coal ash issues in the Town of Pines. Since that time, I have been an active member. Among other things, I have attended and helped with fundraising activities, attended coalition meetings, testified at EPA hearings, participated in a rally at the Michigan City Generating Station to call attention to the need for a safe solution the harmful disposal of coal ash there.

4. Coal ash has affected Kristine and I, our family, and our neighbors in many negative ways. Coal ash was one of the reasons we left Michigan City in 1990.  Coal ash dust was regularly falling all over our neighborhood. It was so bad that NIPSCO, the site owner, was paying for the cleaning costs of

2

nearby boat owners whose boats were regularly coated with coal ash dust. There was also a constant stench coming from the site. Kristine's sister, who also grew up in Michigan City, suffered a miscarriage and we worry that years of exposure to coal ash played a part in this. We also have friends who still live in Michigan City. We worry about what they're being exposed to and what we're being exposed to when we visit them.

5. We enjoy the outdoors and one of our favorite activities is fossil hunting on the beaches of Lake Michigan in Beverly Shores and Michigan City. We also love the nearby Indiana Dunes but worry about what we're being exposed to when we're outside. When we moved to Pines Township, we thought we were escaping coal ash, only to discover that ash from Michigan City had been used as fill in the area. Because of coal ash polluting drinking water, we installed a special water filtration system in our home. Last summer we met a scientist from Duke University, who told Kristine that the vegetables she was growing in her garden were probably not safe to consume due to groundwater pollution from coal ash. We can't grow our own vegetables or have chickens, both of which we'd like to do. Instead, we buy vegetables and get our eggs from someone who lives far away.

6. Living with coal ash and near the Michigan City Generating Station is a source of constant stress and anxiety. The steel retaining walls that prevent

3

coal ash at the site from spilling into Lake Michigan are at the end of their life cycle and could fail any day. They are also permeable by design, and we know that contamination routinely leaks into the lake. Waves regularly go over the wall and contaminated water from the site goes right into Trail Creek.

7. All the health unknowns we live with are stressful. Of the core group of PINES members, about half are dead, not from old age and many from cancer. It's hard to say that coal ash is the specific cause in each of these cases, but we know that the ash contains carcinogens. Every time one of our children has a health problem, we worry that it's because we raised them near coal ash and that it could be a sign of devastating illness.

8. I know that EPA's 2024 rule requires NIPSCO to deal with all of the coal ash at the Michigan City site. Safely cleaning this up would be a tremendous benefit to Kristine and I, our fellow JTNWI members, and to our family, friends and community members. Any legal action that delays or potentially prevents implementation of the rule would greatly harm us and our community.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct. Executed on this day _14__ of July 2024 in _Pines Twp, Indiana.



_____/s/_Paul Kysel_____

Paul Kysel

ADD022

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| City Utilities of Springfield, Missouri by and through the Board of Public Utilities,<br><br>Petitioner,<br><br>*v.*<br><br><br>United States Environmental Protection Agency and Michael S. Regan Administrator, U.S. Environmental Protection Agency,<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 24-1200<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF JENNIFER CONNER IN SUPPORT OF SIERRA CLUB'S MOTION TO INTERVENE

I, Jennifer Conner, do declare as follows:

1.    My name is Jennifer Conner.  I am over 18 years of age.  The information in this declaration is based on my personal knowledge or public information in government records and, if called to testify, I would testify to the facts as stated in this declaration.

2.    I first joined the Sierra Club in 2012. I have been a lifetime member of the Club since 2019.

1

3.      I live in Pierce City, Missouri, about 40 miles southwest of the John Twitty Energy Center ("Twitty"). Twitty is a coal-burning power plant that is owned and operated by City Utilities of Springfield, Missouri.

4.      My drinking and household water is supplied by a well that draws from the Ozark Aquifer. I understand that the Ozark Aquifer is an aquifer system that underlies the Springfield Aquifer. Both aquifers are in karst areas, containing numerous sinkholes and highly permeable limestone

5.      I understand that Twitty is located on top of the Springfield Aquifer in an area with karst topography and that contamination from coal ash at the Twitty site that enters groundwater may flow into the Springfield Aquifer.

6.      I am familiar with dye tracing studies performed in 2019 where dye injected into the groundwater at the Twitty site was later observed in two nearby springs and Wilson's Creek, which flows along the eastern edge of the Twitty site. Wilson's Creek contains a swallow hole, where water disappears into a losing stream underground and reemerges further downstream.

7.      My husband, my children, and I kayak in the James River several times each year. Wilson's Creek flows into the James River about six miles south of Twitty. I enjoy observing wildlife in and along the James River, as well as the experience of being in, on, and around natural and scenic bodies of water in southwestern Missouri such as the James River.

2

8.      I understand that coal ash contains numerous contaminants, including lead, mercury, cadmium, and arsenic, that can have significant and harmful impacts on human health and wildlife , as well as contaminants, such as selenium, that can have significant and harmful impacts on river ecosystems.

9.      I am concerned that my drinking water may contain elevated levels of harmful constituents due to contamination of the Ozark Aquifer complex from coal ash deposited in and around Twitty due to the unpredictable nature of groundwater movement in karst areas.

10.     I am also concerned about exposure to coal ash constituents while paddling in the James River and the impact of this contamination on plants and animals in and around the James River.

11.     I understand that on May 8, 2024, EPA published the Legacy CCR Rule, which, among other things, applies regulatory safeguards to previously exempted legacy ponds and inactive landfills, as well as ash outside of previously identified landfills at active electric generating units. I understand that on June 13, 2024, City Utilities of Springfield, Missouri, by and through the Board of Public Utilities ("City Utilities"), filed a Petition for Review of the Legacy CCR Rule.

12.     I am concerned that if City Utilities' Petition is successful, and some or all of the Legacy CCR Rule is invalidated or vacated, City Utilities will allow coal ash at the Twitty site to contaminate groundwater. In particular, I am concerned

3

that coal ash outside of the landfill will contaminate groundwater and Wilson's Creek, to harm plant and animal life in the James River, and to flow into the Ozark Aquifer, resulting in harmful constituents in water I and my family drink and bathe in. I am also concerned that if City Utilities is successful in their Petition, they will fail to take steps required under the Legacy CCR Rule to identify, monitor, and remove sources of coal ash contamination at the Twitty site which are currently unknown or unidentified.

13.    I understand that Sierra Club is seeking to intervene in the above-captioned proceeding in support of the Legacy CCR Rule.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct.

Executed on July _14_, 2024.

/s/_Jennifer Conner_____

Jennifer Conner

4

ORAL ARGUMENT NOT YET SCHEDULED

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| CITY UTILITIES OF SPRINGFIELD, MISSOURI BY AND THROUGH THE BOARD OF PUBLIC UTILITIES, | ) ) ) ) ) | |
| *Petitioner,* | ) ) | **Case No. 24-1200** |
| v. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | ) ) ) ) ) | |
| *Respondents.* | | |

DECLARATION OF DEAN NAUJOKS

I, Dean Naujoks, declare and state as follows:

1. My name is Dean Naujoks. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2. I have been the Potomac Riverkeeper since 2015 and have worked as part of the Waterkeeper Alliance for over 23 years. I began as the Upper Neuse

1

Riverkeeper in North Carolina, and later became the Yadkin Riverkeeper, also in North Carolina, where I also served as Executive Director until 2014.

3. Potomac Riverkeeper's mission is to protect the right to clean water for all communities, and address pollution, drinking water safety, and water quality for communities who live near and rely on the Potomac and Shenandoah watersheds. As a member of Waterkeeper Alliance and Potomac Riverkeeper, I am deeply concerned about the impacts that unsafe coal ash storage has on our rivers and our members.

4. I specifically work on water quality issues spanning from Harper's Ferry to Chesapeake Bay, which covers about 6,000 square miles of the Potomac River watershed. My work includes securing grants, participating in strategy meetings, sampling water on our research boat and surveying the river by boat and drone, identifying pollution, pushing for legislation to protect water quality, and participating in litigation. We do this work to enforce environmental laws and resolve water pollution from various sources including PFAS and coal ash. Potomac Riverkeeper also engages with the media and public to advocate for public health and clean water.

5. Members can join Potomac Riverkeeper in various ways. Some members join by donating, and others volunteer in our field work. We have a robust water monitoring program with 100 trained volunteers. Volunteers also run

2

our certified research boat and help us gather data to inform the public about water quality. About 500 to 600 volunteers work with us throughout the year, and about 2000 members pay dues or donate to support our work.

6. Through my work as a Riverkeeper, I have learned that coal ash is extremely harmful to public health and water quality. I became aware of the dangers of coal ash following the Dan River coal ash spill in North Carolina in 2014. Around this time, I was contacted by a property owner about toxic seeps into the Yadkin River that were migrating onto his land. We sampled those seeps and his drinking well and found high levels of heavy metal contamination. We also learned that his wife had a brain tumor that was removed, and he himself had heavy metal poisoning. Following this, a donor provided funding for us to test five drinking water wells near the Buck Steam Power Plant, which burned coal along the Yadkin River in Rowan County, North Carolina for decades. We tested drinking wells and groundwater and found high levels of heavy metal contamination in the water that people were drinking.

7. During that time, North Carolina implemented testing around coal ash sites, and found that over 85% of drinking wells within a half mile of a coal ash pond were issued do not drink advisories. Well testing confirmed coal ash leaks from unlined pits, and many homeowners whose wells were tested

3

were issued "Do Not Drink" letters. This made me aware that coal ash

pollution is a national issue that harms the lives of too many communities

around current and former coal plants.

8. As a Riverkeeper, I regularly meet Riverkeeper members and other

community members affected by coal ash. For example, through my work I

have come to know a family with four children that lives in close proximity

to a coal power plant. Two were born before they moved near the plant and

two were born after they located there. Compared to the children born away

from the area, the younger children have had much more significant health

issues that will persist for their lives. Many of our members who live near

coal ash ponds have shared that their own families suffer health problems

that research has associated with the chemicals found in coal ash

contamination, including infertility and cancer.

9. There are several coal ash sites along the Potomac River endangering the

water quality and community. For example, at the Possum Point plant on the

river in Dumfries, Virginia, the plant owner, Dominion Energy, has over 30

years of documented coal ash contamination in ground water. Dominion's

own monitoring shows that contaminants from coal ash at the Possum Point

site, like arsenic, boron and heavy metals are present at levels that exceed

groundwater quality standards and are contaminating the Potomac River.

Possum Point is only one of several coal plants that sit along the Potomac River.

10. When I started working at Potomac Riverkeeper, I discovered that unlined coal ash ponds were regularly leaking water containing heavy metal into nearby water. Lab tests around coal ash units revealed contamination from carcinogenic metals linked to coal ash. In one egregious instance, aerial surveillance showed that Dominion drained a 52-million-gallon ash pond of wastewater into Quantico Creek. Affected neighbors were outraged and joined Potomac Riverkeepers "Move Your Ash" campaign. Potomac Riverkeeper's legislative advocacy work resulted in the passing of legislation that required Dominion to clean up ash ponds, recycle some, and test water a mile out from the ponds. This water testing revealed coal ash contamination in nearby wells. Despite this mandate, there are still people near that site that have to drink bottled water because their faucet water is unsafe.

11. The Potomac River is threatened by unregulated coal ash dumpsites along the river. Through my work as a Riverkeeper and I have seen the tragic effects of coal ash on families and public health. For example, I see watermen on the river harvesting fish that I know are contaminated from coal ash pollutants, and presumably selling these fish to markets. Consumers

5

buying these fish have no way of knowing they come from contaminated waters I understand the 2024 Rule will address legacy coal ash sites and previously unregulated coal ash units. The 2024 Legacy CCR Rule will make polluters clean up all of the coal ash ponds and landfills that are leaking into groundwater. This will help restore a sense of safety to community members who rely on local water sources for their drinking water and protect local waterbodies from further pollution.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct. Executed on this day 12th day of July 2024, in Accokeek, Maryland.

Dean Naujoks

## DECLARATION OF FLETCHER SAMS

1.    My name is Fletcher Sams. I am over the age of 18. I have personal knowledge of the matters stated herein.

2.    I am Executive Director and Riverkeeper of the Altamaha Riverkeeper, Inc. and have held that position since 2019.

3.    Altamaha Riverkeeper is a § 501(c)(3) nonprofit citizens advocacy organization headquartered in Brunswick, Georgia. The Riverkeeper is a grassroots organization dedicated to the protection, defense, and restoration of the Altamaha River, including its tributaries, the Ocmulgee River, the Oconee River, and the Ohoopee River, and the groundwaters and marshlands that are connected to these surface waters. Altamaha Riverkeeper has individual members who reside throughout the Altamaha River Basin, which covers about 14,000 square miles – one of the largest river basins in the nation.

4.    Altamaha Riverkeeper works to safeguard and improve water quality in the Altamaha River Basin by the safe, proper disposal of coal ash in fully lined, dry landfills, given that coal ash is an industrial waste that is known to contain toxic metals and public records show that coal ash is submerged in groundwater at Georgia Power sites including Plant Scherer.

5.    As part of those efforts, Altamaha Riverkeeper has submitted comments to the Georgia Environmental Protection Division regarding Georgia Power's applications for proposed CCR Rule permits for its closure plans at sites including Plant Scherer.

6.    Georgia Power's attempts to cap its coal ash in place while leaving the ash saturated in groundwater where it will continue to leach out contaminants, frustrate the mission of Altamaha Riverkeeper to protect the water resources of the Altamaha River Basin, including groundwater, streams, and the Ocmulgee River. Altamaha Riverkeeper has an interest in rigorous

application of the closure standards and groundwater remediation requirements of the CCR Rule, including the new CCR Legacy Rule, to unlined coal ash in our territory including Plant Scherer.

7.    In addition, members of the Altamaha Riverkeeper reside in the communities near and downstream of Plant Scherer and have concerns about ongoing coal ash pollution, water quality issues, and Georgia Power's coal ash closure plans at Plant Scherer. These members are personally affected: their concerns include pollution of drinking water and surface waters, along with impacts to wildlife and the natural environment, as well as the long-term risk of a spill from a structural failure, all of which will continue indefinitely if the ash is capped in place.

8.    Protecting the groundwater, streams, and Ocmulgee River within the Altamaha River Basin is central to the Altamaha Riverkeeper's mission, as is protecting our members' ability to enjoy clean water and the natural environment of the River Basin.

9.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ___7/9/___, 2024.

_____
Fletcher Sams

2

## DECLARATION OF JASON ULSETH

1.    My name is Jason Ulseth. I am over the age of 18. I have personal knowledge of the matters stated herein.

2.    I am the Riverkeeper and Executive Director of Chattahoochee Riverkeeper ("CRK"). I have held the position of Riverkeeper since 2015 and of Executive Director since 2023.

3.    CRK is a nonprofit corporation organized under the laws of the State of Georgia with approximately 10,000 members, and its primary office in Atlanta, Georgia. CRK's mission is to advocate and secure the protection and stewardship of the Chattahoochee River, its lakes, tributaries, and watershed, in order to restore and preserve their ecological health for the people and wildlife that depend on the river system.

4.    As part of its mission CRK advocates for the removal of coal ash from unlined, leaking storage areas where the ash is submerged in groundwater. CRK has submitted comments to the Georgia Environmental Protection Division regarding Georgia Power's applications for proposed CCR Rule permits for its closure plans at sites including Plants McDonough and Yates on the Chattahoochee River. CRK has an interest in broad application of the CCR Rule's protective standards for closure and groundwater remediation at the coal ash sites in our territory, including the requirements of the new CCR Legacy Rule.

5.    CRK members live near, and operate businesses, recreate, and fish on the Chattahoochee River and its tributaries downstream of Georgia Power's Plant McDonough and Plant Yates. The quality of the Chattahoochee River and its tributaries affects the recreational, aesthetic, and environmental interests of CRK's members.

1

6.    CRK members have suffered injuries to their recreational, aesthetic, environmental, and business interests due to coal ash pollution from Plants McDonough and Yates into Chattahochee River and the groundwater and tributaries that feed into it.  Aesthetic enjoyment and use of the resources of the River are impeded when pollutants are added which have the capability of harming humans and aquatic organisms that are exposed to them.  The permanent storage of wet coal ash along the River also poses the long-term risk of a spill, further threatening these members' interests and those of CRK.

7.    Ensuring that the CCR Rule's requirements are applied to Georgia Power's coal ash sites will help protect and restore water quality in the Chattahoochee River, thereby promoting and protecting CRK's organizational interests and CRK members' use and enjoyment of the River.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ___7/9___, 2024

_____
Jason Ulseth

ORAL ARGUMENT NOT YET SCHEDULED

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| **CITY UTILITIES OF SPRINGFIELD, MISSOURI BY AND THROUGH THE BOARD OF PUBLIC UTILITIES,** | ) ) ) ) ) | |
| *Petitioner,* | ) ) | **Case No. 24-1200** |
| v. | ) ) | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,** | ) ) ) ) ) | |
| *Respondents.* | | |

## DECLARATION OF CELESTE FLORES

I, Celeste Flores, declare and state as follows:

1. My name is Celeste Flores. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2. I am the co-chair of the Steering Committee of Clean Power Lake County ("CPLC"). CPLC is a nonprofit organization that seeks to help the Lake County community obtain environmental and social justice. CPLC was

created in 2013 to focus on a just transition for coal plants, one that would address pollution and promote economic development that did not threaten health and the environment. CPLC has since expanded its work to other issues affecting the environment and people's well-being in Lake County. I submit this declaration to support CPLC's participation as an intervenor in City Utilities of Springfield, Missouri's challenge to EPA's 2024 Final Rule regulating legacy CCR surface impoundments and CCR management units.

3. I joined CPLC in 2014 after I attended a public event on Waukegan Beach. This was the first time I saw how close the NRG coal plant ("Waukegan power plant") was to the waters of Lake Michigan. This experience inspired me to get involved with CPLC to advocate for the retirement and cleanup of the coal plant.

4. Since joining CPLC, I have held numerous positions, including volunteer, a paid staff member, and Steering Committee member. My work as co-chair includes keeping track of the Steering Committee and their capacity. I also establish and maintain government relationships, supervise staff, and help lead meetings and advocacy efforts. Through my position I am knowledgeable about membership at CPLC, including the membership of Dulce Ortiz. *See* accompanying Declaration of Dulce Ortiz.

ADD038

5.  CPLC's mission is "to ensure clean air, clean water, and healthy soil for every Lake County community member and to achieve the self-determination of those disproportionately impacted by environmental pollution."

6.  To achieve this mission, Clean Power Lake County advocated for a retirement plan for the coal-fired power plant in Waukegan and for the effective clean-up of the pollution it has left behind. Members also work to promote clean energy projects that can create local jobs and tax revenue. CPLC has interests in the matters addressed in this litigation, and its interests are aligned with the interests of its individual members.

7.  CPLC membership is open to anyone who shares our mission and is willing to dedicate time to achieving it. Members attend our meetings, participate in trips to Springfield, IL and Washington, DC to share our concerns with decision-makers and advocate for remedies, and otherwise contribute to the various activities we undertake to improve Lake County. CPLC's Steering Committee conducts meetings with members and sends out member communications to ensure that members are aware of relevant developments and volunteer opportunities, and to ensure that members have the opportunity to weigh in on our collective work.

8. The Waukegan power plant is located very close to the shores of Lake Michigan. Its last two coal-fired generation units were retired in 2022, but years of operation have left a toxic mess behind. There are two CCR impoundments on the site that are regulated by the 2015 CCR Rule and still awaiting cleanup. There is also coal ash at the site that was not regulated by the 2015 Rule but is regulated by the 2024 Legacy CCR Rule. This includes coal ash that is in direct contact with ground water. Testing shows groundwater contamination at the site that I fear is migrating to Lake Michigan and into the Waukegan community.

9. Lake Michigan is a valuable resource for CPLC member and Waukegan residents generally. It is the source of our drinking water and members and residents fish and swim in the water and recreate along the lakefront. Unsafe coal ash disposal at the Waukegan plant threatens their health and environment.

10. When the power plant in Waukegan was active, CPLC members would wake up to find their cars covered in ash and debris from the power plant. This history and the continued presence of coal ash in Waukegan has caused the health of our members to suffer. From a respiratory health association report, we know that one in three children in Waukegan have asthma or

asthma related symptoms. We know from another report that living close to a coal ash pond is more toxic than smoking a pack of cigarettes a day.

11. From my work with CPLC, I know that boron, lead, arsenic, and other pollutants are found in coal ash. Groundwater testing in Waukegan reveals contamination of these chemicals. We know that the pollutants from coal ash are leaking into the ground water table and can contaminate our drinking water and endanger public health.

12. Living near the Waukegan power plant and the resulting harm from coal ash has damaged the mental health of our members and resulted in community trauma. The contamination of Lake Michigan and air pollution from coal ash causes a sense of stress and fear in the community. We are a working class, minority community, and our members are overwhelmed by every day, pressing issues such as childcare, work, and healthcare. Cleaning up the coal ash in Waukegan would alleviate stress on our members and allow them to focus on their families instead of the threats to their health from unsafe coal ash dumps.

13. To address the health impacts of coal ash, CPLC engages in grassroots advocacy at the state and national level. All of CPLC's advocacy and litigation is in support of and aligned with the interests of its members.

14. In 2017 and 2018, CPLC was part of a statewide coalition to address the coal ash crisis. It was discovered that 22 out of 24 power plants in Illinois storing coal ash had unsafe groundwater pollution levels. This compelled the legislature to act and pass Senate Bill 9 ("SB 9"), the Coal Ash Pollution Prevention Act. CPLC brought members to Springfield to provide testimony on the issue and pressure the state to implement SB 9. CPLC then directed its advocacy towards the Illinois EPA as it developed rules to implement SB 9. CPLC brought members to hearings and ensured that they could meaningfully participate. CPLC's activity at hearings helped ensure transparency and community involvement. Specifically, we wanted NRG to be held responsible, for coal ash in Waukegan to be cleaned up, and for environmental justice communities to be prioritized. We continue to work with Illinois to implement SB 9.

15. In 2022, CPLC was part of a group of environmental organizations that brought a lawsuit to compel the EPA to address inactive landfills. This resulted in a Consent Decree between our groups and EPA in which EPA committed to assessing risks from inactive landfills and to taking any needed action. This led, in part, to the 2024 Legacy CCR Rule.

16. On June 27, 2023, CPLC participated in a Waukegan Coal Ash Community Meeting held by the Illinois EPA. At this hearing, dozens of CPLC members

and Waukegan residents, including me, provided testimony urging EPA to regulate all coal ash and ensure safe cleanup and closure of sites. I encouraged EPA to address coal ash ponds not covered by the 2015 rule, and to remove all coal ash from our lakefront. Other members of CPLC spoke to share how the toxic pollution and industrial history of Waukegan has impacted their livelihood and health. CPLC members also testified the next day at EPA's in-person hearing on the then-proposed Legacy CCR Rule in Chicago.

17. If the coal ash is not cleaned up, the unregulated coal ash ponds will continue leaking contaminants into groundwater and threatening their health. Research from Illinois Environmental Law and Policy Center shows that if Lake Michigan water level trends continue, the tides will overflow onto the Waukegan power plant property. Current clean-up measures at the site, including NRG's proposal to place a cap over the two surface impoundments regulated by the 2015 Rule, without removing any of their coal ash, will not protect Lake Michigan and our community if this happens as coal ash comes into contact with and contaminates lake water. It is imperative that this coal ash is cleaned up and removed in a responsible way to protect Waukegan and CPLC members.

18. The 2024 Final Rule would greatly benefit CPLC members and the Waukegan community. Cleaning up coal ash that was left unregulated by the 2015 Rule is necessary to protect the health of the Waukegan community, our nearby waters, and our environment. If the challenge to the 2024 Final Rule is successful, coal ash will continue to pollute our water and harm our members and the broader community.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct. Executed on this day 10th day of July 2024, in Waukegan, Illinois.

*Celeste Flores*

Celeste Flores

8

## DECLARATION OF JESSE DEMONBRUEN-CHAPMAN

1.      My name is Jesse Demonbruen-Chapman I am over the age of 18. I have personal knowledge of the matters stated herein.

2.      I am Executive Director and Riverkeeper of Coosa River Basin Initiative, and have held that position since 2016.

3.      Coosa River Basin Initiative (CRBI) is a § 501(c)(3) nonprofit citizens advocacy organization founded in 1993 and headquartered in Rome, Georgia. CRBI seeks to protect, preserve, and restore one of North America's most biologically diverse river systems, the upper Coosa River basin. The Coosa is a key component of the legendary Alabama-Coosa-Tallapoosa (ACT) river basin system.

4.      The upper Coosa River basin stretches from southeastern Tennessee and north central Georgia to Weiss Dam in Northeast Alabama, covering over 5,500 square miles.  The Coosa River Basin includes the Coosa River, the Etowah and Oostanaula rivers, and the tributaries of these waterways as well as the land drained by these streams.  CRBI fulfills its mission through education, advocacy, monitoring, public engagement, social events, sampling, pollution prevention measures, petitioning the government and agencies on important issues affecting the watershed, and seeking redress in the courts where reasonably necessary. CRBI is a member organization with more than 500 members, including individuals, families, and businesses – many of whom live and work, swim, fish, boat, recreate, and engage in social events in, near, and on the Coosa River and connected groundwaters and creeks.

5.      In furtherance of its mission to safeguard against threats to water quality, CRBI has been a leading voice in Georgia calling for the safe, responsible and proper disposal of coal ash, so that it will be separated from groundwater and avoid the risks of unlined coal ash

disposal. Science and common sense indicate that coal ash, a known industrial waste that contains toxic metals, should not be left in contact with groundwater, where it will continue to contaminate groundwater and connected waters.

6.     Plant Hammond is a retired coal-fired power plant that has long operated on the shores of the Coosa River near Rome, Georgia. The plant has a variety of unlined coal ash storage areas that are submerged in groundwater and monitoring well data show the ash continues to contaminate the groundwater.

7.     Protecting the groundwater, streams, and River of the Coosa Basin is central to CRBI's mission, as is protecting our members' ability to enjoy clean water and the natural environment of the Coosa River Basin. CRBI's mission includes ensuring the protective standards of the CCR Rule and the new Legacy Rule are complied with, including closure and groundwater remediation across the site.

8.     In addition, CRBI's members own property and use the water resources near and downstream of Plant Hammond and have concerns about ongoing coal ash pollution, water quality, and Georgia Power's coal ash pond closure plans at Plant Hammond. These concerns include pollution of the Coosa River and its wildlife, impacts to their enjoyment of fishing, boating and swimming, as well as the long-term risk of a coal ash spill, all of which will continue indefinitely if the ash at Plant Hammond remains capped in place.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed on __June 24____, 2024.


_____

Jesse Demonbruen-Chapman

ADD047

<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| **CITY UTILITIES OF SPRINGFIELD, MISSOURI BY AND THROUGH THE BOARD OF PUBLIC UTILITIES,** )<br><br>)<br><br>)<br><br>)<br><br>)<br>*Petitioner,* )<br><br>)<br>**v.** )<br><br>)<br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,** )<br><br>)<br><br>)<br><br>)<br><br>)<br><br>*Respondents.* | **Case No. 24-1200** |

<u>**DECLARATION OF DAVID VAN GILDER**</u>

I, David Van Gilder, declare and state as follows:

1. My name is David Van Gilder. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2. I am the Senior Policy and Legal Director of the Hoosier Environmental Council ("HEC"). Through my work at HEC, I am familiar with the organization's purposes and membership records and policies. I have been

ADD048

employed by the Hoosier Environmental Council since July 2023, and prior
to that I served on the Board of Directors almost continuously since 1991.

3. HEC is a nonprofit corporation located in Indiana and founded in 1983. HEC
is an environmental advocacy group with members throughout Indiana,
including members who live near coal ash dumps such as the Wabash River
Station in Terre Haute, Indiana, the Michigan City Generating Station in
Michigan City, Indiana, and the Tanners Creek Generating Station in
Lawrenceburg, Indiana. I believe that the 2024 Rule would significantly
improve coal ash cleanup at these sites.

4. HEC aims to reduce the footprint of industry, commerce, and agriculture on
the environment. HEC works to protect Indiana's air, water, and wildlife
through education, research, technical assistance, and public policy
advocacy, and through legal enforcement of federal, state, and local laws. To
achieve these goals, HEC seeks federal and state implementation and
enforcement of environmental laws and regulations. When necessary, HEC
initiates legal action on behalf of itself and its members. The activities that
HEC engages in are aligned with the interests of its members.

5. Membership is conferred on individuals who support the mission of HEC
through financial, in-kind, and volunteer contributions to the organization.

HEC's bylaws establish a class of non-voting members as allowed by the Non-Profit Act, see Ind. Code § 23-17-7-4 and -11-3(a).

6. Coal ash dumps in Indiana pose a threat to the health and safety of HEC members. Coal ash, also known as coal combustion residuals or "CCR", contaminates ground water, which impacts our members' drinking water and the quality of Indiana's water and the health of its wildlife. Indiana has at least twenty coal ash impoundments that state regulators have historically viewed as non-federal, meaning they were purportedly not subject to the U.S. Environmental Protection Agency's ("EPA's") 2015 CCR Rule and were closed under state monitoring. Indiana allowed a number of these sites to close without removing coal ash, which has left ash in contact with groundwater and in some instances in flood plains with only a cap, or cover, over it. This is an inadequate and unsafe way to dispose of coal. In 2023, the Indiana legislature passed a law, House Enrolled Act 1623, which prohibits the state environmental agency from adopting coal ash regulations that are more stringent than those of the EPA. Given these historical practices, and the recently enacted legislation, the Legacy CCR Rule is of great importance to Indiana, HEC, and its members.

7. The Tanners Creek facility is one example of this. It is located in the floodplain of the Ohio River and sits on a shallow aquifer. The Tanners

3

Creek power plant stopped generating electricity in May 2015 and as a result was exempted from the monitoring and clean up requirements of EPA's 2015 CCR rule. The site has CCR in a landfill, in an open dump, and in at least three CCR surface impoundments. There is evidence that the open dump and one surface impoundment are contaminating groundwater. Groundwater sampling has shown high concentrations of arsenic and lithium. The site is near municipal supply wells. Under the 2024 rule, Tanners Creek is considered an "inactive facility" with at least one "Legacy CCR Surface Impoundment." As a result, the site owner is obligated to monitor and address groundwater contamination at the site, and to develop a closure plan for its dumps that will require them to address contamination and prevent contamination from occurring in the future.

8. The power plant at Tanners Creek is one of many coal ash impoundments in contact with groundwater in Indiana. Many of these impoundments qualify as Legacy CCR Surface Impoundments under the 2024 Rule. Cleanup of these legacy surface impoundments under the rule would benefit HEC and its members. The organization would focus more time and resources on other sources of pollution in the waters of the State, and HEC's members who live near or derive their drinking water downstream or downgradient from these sites would suffer less pollution in that water.

4

9. The Michigan City Generating Station ("MCGS") and Wabash River Station are also Indiana sites that I believe would be required to take action to address coal ash under the 2024 Rule. The Wabash River Station stopped generating electricity in 2016 and includes an unlined North Ash Pond that stopped receiving CCR prior to 1990. Groundwater levels at the Wabash River Station are tied to the water level of the adjacent Wabash River. Groundwater monitoring from the Wabash River Station site has shown elevated concentrations of arsenic, boron, lithium, molybdenum, and sulfate, which are moving towards the Wabash River. The North Pond was approved for closure-in-place by the state, but the closure plan is inadequate to prevent coal ash from contacting groundwater, leaving the adjacent waters at risk. I believe that the 2024 Rule would greatly benefit the cleanup of this site and protection of its adjacent waters and wildlife.

10. The Michigan City Generating Station ("MCGS") is still producing power and has large amounts of coal ash that are outside of coal ash ponds regulated by the 2015 CCR Rule. Part of the unregulated ash is buried in an unlined coal ash impoundment that I believe will now qualify as a Coal Combustion Residual Management Unit ("CCRMU") under the 2024 Rule, requiring monitoring and clean-up for the first time. The disposal of coal ash at MCGS is a significant risk to Lake Michigan. Groundwater monitoring at

MCGS has revealed arsenic, lithium, and molybdenum at levels that exceed drinking water standards. There is documentation of CCR contaminants migrating to the adjacent lake and to a nearby stream. The 2024 rule would result in a more effective cleanup and closure of coal ash units at MCGS.

11. HEC engages in advocacy to seek the safe cleanup and closure of coal ash disposal units. HEC has submitted legal and technical comments to both the Indiana Department of Environmental Management ("IDEM") and to EPA to express concerns and identify deficiencies in companies' coal ash closure plans, which contribute to contamination of groundwater and threaten drinking water supplies and the quality of nearby surface waters like the Ohio River. HEC has met with officials from IDEM and EPA to voice concerns about coal ash pollution and advocate for the implementation of federal and state coal ash regulations.

12. HEC also partners with groups from other states and with national groups to urge EPA to more effectively regulate coal ash and enforce existing environmental protections at coal ash disposal sites. Since 2004 HEC has joined numerous letters and written public comments to EPA, urging EPA to establish, implement, and enforce adequate health and safety protections around coal ash sites in Indiana and throughout the country.

13. On July 17, 2023, HEC submitted comments to the EPA on its proposed Legacy CCR Rule. HEC members also testified before EPA at in-person and online hearings on this rule. In HEC's comments and testimony, it supported EPA's proposal to close loopholes which will result in millions of tons of coal ash being cleaned up. HEC also urged EPA to strengthen the regulations to protect people and water from coal ash pollution.

14. As noted above, in 2023, the Indiana General Assembly passed HEA 1623, which prohibits Indiana from having any regulations of coal ash other than what the federal government requires. For this reason, Indiana and HEC members are completely dependent on federal coal ash rules to keep the people of Indiana and its water sources and wildlife safe.

15. Delaying coal ash impoundment closures and potentially undoing important new protections would injure HEC members who are personally harmed by pollution from these sites. In particular, the new federal rule will facilitate coal ash impoundment closure in floodplains, which are risky and imprudent locations for disposal of waste. The physical interaction of flowing water and the coal combustion residuals in the floodplain causes pollution in the rivers and in groundwater, both of which are sources of drinking water for HEC members.

7

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct. Executed this 10th day of July 2024, in Indianapolis, Indiana.

David Van Gilder

8

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **CITY UTILITIES OF SPRINGFIELD, MISSOURI BY AND THROUGH THE BOARD OF PUBLIC UTILITIES,** ) ) ) ) ) | |
| *Petitioner,* ) ) | **Case No. 24-1200** |
| **v.** ) ) | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,** ) ) ) ) | |
| *Respondents.* | |

## DECLARATION OF ASHLEY WILLIAMS

I, Ashley Williams, declare and state as follows:

1.  My name is Ashley Williams. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2.  I am the Executive Director Just Transition Northwest Indiana ("JTNWI"). Just Transition Northwest Indiana is a grassroots environmental justice

1

ADD056

organization. Its mission is to educate and organize Northwest Indiana communities and workers, give voice to our shared stories, and support a just transition to a regenerative economy that protects the environment, climate, and future generations.

3. I founded the organization in 2020 after working with the Sierra Club on the Beyond Coal campaign. I am a Michigan City resident and I wanted to protect my community by ensuring the clean closure of the NIPSCO Michigan City Generating Station ("MCGS"), a coal-burning power plant on the shore of Lake Michigan, and to remove the coal ash waste that the plant generates. Through my role as Executive Director and work at JTNWI, I am familiar with the organization's goals, projects, membership information, and activities relating to coal combustion waste.

4. JTNWI members sign up through an online form and donate either monthly, quarterly, or annually. We hold quarterly membership meetings to inform people about current programs and ways to get involved. Once a member joins, they have many ways to participate in our work such as attending rallies, knocking on doors, collecting petition signatures, testifying at hearings before government bodies, and representing JTNWI at tabling events.

5.  Members can also join program committees and become chairs of those committees. Currently, we have four program committees: the Protect Lake Michigan Campaign, which focuses on the threat of coal ash from MCGS and throughout Indiana and the country; the No False Solutions NWI Campaign, which works on addressing the impacts of the proposed Midwest hydrogen hub and promoting alternative routes to industrial decarbonization; the Visioning Project Arts Campaign, which engages the community in realizing a just transition through art; and the Rapid Response Issues Committee, which acts on threats and opportunities that arise through policy advocacy and other avenues.

6.  Through our work, some JTNWI members, particularly those who live on the west side of Michigan City closest to MCGS, have been given PurpleAir monitoring sensors. These help us monitor contamination from coal ash, collect data on particulate matter pollutant spikes, and continue to educate our members about air pollution.

7.  JTNWI and its members have an interest in this matter because of the coal ash deposit at MCGS that is contaminating the onsite groundwater and leaking into both Lake Michigan and the nearby Trail Creek. Coal ash pollution from the Michigan City plant degrades environmental quality in the region, threatens Lake Michigan and local wildlife, and jeopardizes the

3

drinking water that our community and many others draw from Lake
Michigan.

8.  I live just over a mile away from the Michigan City plant. Because I visit or
    pass the area every day, I am concerned about my increased exposure to coal
    ash that blows into the air.  Because of coal ash pollution in the lake and
    creek, I avoid recreating in the area next to MCGS and I am afraid to eat fish
    that are caught in the area. Similarly, our members who live and work near
    MCGS avoid activities and local amenities that they would take advantage
    of if it were not for coal ash contamination from MCGS and the risk of a
    coal ash spill.

9.  Much of the MCGS site is composed of "made land," two million tons of
    coal ash and other materials that extend right up to Lake Michigan. This coal
    ash "fill" is exempted from regulation under EPA's 2015 coal ash rule but is
    subject to regulation under its recently adopted 2024 rule. The only thing
    preventing a catastrophic spill of this coal ash into Lake Michigan are steel
    retaining walls that are over 70 years old and deteriorating.

10. We see this as a "ticking time bomb" given the noticeable degradation of the
    wall structure. NIPSCO has plans to strengthen it, but this is not a long-term
    or sufficient solution. The wall does not adequately protect Lake Michigan
    or the people that live and recreate around the lake. The coal ash at MCGS

4

warrants a much more robust cleanup and closure plan and the 2024 Legacy

CCR Rule requires NIPSCO to do this.

11. Many of our members will not go out on the lake due to the coal ash

contamination and fear that the retaining walls will rupture. JTNWI

members who would swim, kayak, or spend time along the lake, do not

because they are fearful for their health. Michigan City has high

concentrations of both asthma and cancer, and people are scared that

contamination from the coal ash ponds plays a role in this.

12. To address the coal ash issue at MCGS, JTNWI members pressure

lawmakers to act at the local, state, and national level. We have worked with

the Michigan City City Council on municipal resolutions calling for the

clean closure of MCGS. We have also collaborated with our state

representatives to propose legislation that addresses coal ash pollution at

MCGS and advocate for clean closure of coal ash dumps statewide. In 2023,

JTNWI organized turnout and participated in hearings (both in-person and

virtual) held by EPA about the Legacy CCR Rule. We trained people on

providing testimony and provided accommodations, including food and

transportation. In total, JTNWI helped people provide 668 comments to EPA

on the the Legacy CCR Rule. The two hearings were attended by 396

5

people, many of whom were JTNWI members. People harmed by coal ash

travelled from 22 states and Puerto Rico to the in-person Chicago hearing.

13. These activities illustrate how important the 2024 Rule is to JTNWI

members and others harmed by unsafe coal ash disposal. At hearings and

through comments, JTNWI members expressed that the coal ash pollution at

MCGS creates fear, damages public health, and limits their ability to enjoy

Lake Michigan. For this campaign, JTNWI used art to help people visualize

the lived experiences of members of our community and expand public

awareness of the threats of coal ash. This helped to center the stories of our

members and convey the impact coal ash has on their lives.

14. The coal ash deposit at MCGS is considered a legacy unit and was left

unregulated by the 2015 CCR Rule. The 2024 Rule will force NIPSCO to

clean up coal ash at MCGS and ensure that it is done safely. This will

greatly impact nearby residents by protecting our water, and in turn our

health and wildlife. If the coal ash at MCGS is not cleaned up, the pollution

will continue to prevent members from fishing, swimming, and kayaking in

the lake and I fear that sooner or later we will be dealing with another

catastrophic coal ash spill, this time in our community.

6

ADD061

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing

is true and correct. Executed on this day 12th of July 2024, in Michigan City,

Indiana.

_____

Ashley Williams

7

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| City Utilities of Springfield, Missouri by and through the Board of Public Utilities, ) ) ) )<br><br>Petitioner, )<br>)<br>*v.* )<br>)<br>United States Environmental Protection Agency and Michael S. Regan Administrator, U.S. Environmental Protection Agency, ) ) ) ) ) )<br><br>Respondents. ) | Case No. 24-1200 |

## <u>DECLARATION OF JONATHAN LEVENSHUS IN SUPPORT OF SIERRA CLUB'S MOTION TO INTERVENE</u>

I, Jonathan Levenshus, declare and state as follows:

1. My name is Jonathan Levenshus. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2. I am the Director of Federal Campaigns for the Sierra Club's Energy Campaigns and have held this position since March 2022. I joined the Sierra Club staff in 2013, as a Senior Campaign Representative for the Beyond Coal Campaign. I have been a member of Sierra Club since 2013.

3.      Through my membership and my work, I am familiar with Sierra Club's general goals, its current projects, and its membership information, as well as its activities to address disposal sites for coal combustion wastes and the status of federal regulation concerning coal combustion wastes under the Resource Conservation and Recovery Act.

4.      Sierra Club is a national non-profit organization founded in 1892 and incorporated in the State of California as a Nonprofit Public Benefit Corporation. Sierra Club has more than 780,000 members nationwide, including approximately 5,700 members in Missouri and 38,000 members in Illinois.

5.      Sierra Club's mission is: "to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives."

6.      To this end, Sierra Club is engaged in a nationwide campaign to reduce dependence on coal-fired power. Sierra Club is currently litigating to force the clean up or retirement of existing coal plants across the country. Sierra Club is leading advocacy efforts to require the reduction of greenhouse gas emissions and is collaborating with state and local governments to promote energy efficiency, conservation, and increased reliance on renewable energy.

7.     As part of this campaign, for over ten years, Sierra Club has worked at both the local and national levels to address the ongoing problem of water and air quality impairment from coal ash landfills and impoundments. The Club's advocacy has involved efforts to close and clean up existing coal ash disposal sites, including litigation involving discharges from those sites into ground or surface water.

8.     In 2010, the Sierra Club, along with a number of other environmental groups, submitted comments to the U.S. Environmental Protection Agency ("EPA") on its proposed coal ash rule, which provided extensive information about volumes and nature of the waste, the significant risk to human health and the environment, the gross deficiencies of current state regulatory programs and the substantial documented damage that has occurred throughout the United States from mismanaged coal ash.

9.     Since 2010, Sierra Club has continued to work for greater protection from the unsafe dumping of coal ash. For example, in May 2014, the Sierra Club published "Dangerous Waters: America's Coal Ash Crisis," which consists of eight reports highlighting the lax state regulation and dangerous disposal practices and contamination found in North Carolina, Kentucky, Missouri, Virginia, New Mexico, Montana, Indiana, and Illinois.

10.     After EPA finalized coal ash rules in 2015, Sierra Club, along with other organizations, challenged some aspects of the rule and defended other provisions in the D.C. Circuit Court of Appeals. It is my understanding that the Court ruled in Sierra Club's favor on several issues where the Club argued that the rule needed to be strengthened and largely rejected industry arguments that were aimed at weakening the rule. The issues in which the Court ruled in Sierra Club's favor included the finding that EPA acted arbitrarily and capriciously in failing to regulate inactive ponds and landfills at sites where electric generation had ceased. Sierra Club continued to advocate for expanded federal rules that included these sources of coal ash contamination.

11.     On May 8, 2024, EPA finalized changes to CCR regulations under the Resource Conservation and Recovery Act ("RCRA") that would require groundwater monitoring, corrective action, closure, and post-closure care of "legacy coal ash ponds" (inactive surface impoundments at electric generation sites that were inactive as of 2015) as well as "coal combustion residual management units" or "CCRMUs," a term that refers to both inactive landfills at inactive sites and piles of coal ash outside of previously identified landfills or surface impoundments. This Final Rule is sometimes referred to as the "Legacy CCR Rule."

12.     Sierra Club, along with allied environmental organizations, had been an active participant in the rulemaking process culminating in the May 8, 2024 Final Rule. Sierra Club was a co-author of hundreds of pages of technical comments relating to the Legacy CCR Rule, including on the Advanced Notice of Proposed Rulemaking, the Proposed Rules themselves, and a Supplemental Risk Assessment conducted between the Proposed and Final Rules.

13.     Sierra Club members, including a representative of the White River Group of the Missouri Sierra Club, also submitted hundreds of individual comments on the Legacy CCR Rule.

14.     It is my understanding that, on June 13, 2024, City Utilities of Springfield, Missouri, sought to challenge the Legacy CCR Rule. I understand that City Utilities owns and operates the John Twitty Energy Center ("Twitty"), a coal-burning power plant located southwest of Springfield, Missouri.

15.     Sierra Club has members who live near the ash sites that are subject to the Legacy CCR Rule and has an interest in identifying the extent and location of CCRMUs and the monitoring and closure of both legacy coal ash ponds and CCRMUs at coal plants throughout the United States in accordance with the requirements of the federal rule so as to accurately characterize the nature and extent of contamination and reduce the impact of coal ash on groundwater. In

particular, Sierra Club members live in areas subject to groundwater contamination from coal ash at the John Twitty site.

16.    Any decision that delays or prevents the implementation of the Legacy Coal Ash Rule will cause significantly more toxic pollution to enter groundwater and surface waters, exposing Sierra Club members and wildlife to higher levels of pollution than they would otherwise be exposed to. This, in turn, will increase the likelihood that Sierra Club members will experience adverse health effects and a diminished ability to enjoy the natural resources in their communities.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct.

Executed on July 11, 2024.

Jonathan Levenshus

ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| CITY UTILITIES OF SPRINGFIELD, MISSOURI BY AND THROUGH THE BOARD OF PUBLIC UTILITIES, | ) ) ) ) ) | |
| *Petitioner,* | ) ) | **Case No. 24-1200** |
| v. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | ) ) ) ) ) | |
| *Respondents.* | | |

## DECLARATION OF DANIEL E. ESTRIN

I, Daniel E. Estrin, declare and state as follows:

1. My name is Daniel E. Estrin. I am over 18 years of age, and I am competent to give this declaration. The information in this declaration is based on my personal knowledge, information, and belief.

2. I submit this declaration in support of Waterkeeper Alliance, Inc.'s ("Waterkeeper Alliance") participation as a respondent-intervenor in petitions filed by City Utilities of Springfield, Missouri, challenging the

United States Environmental Protection Agency's ("EPA") final rule entitled *Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; Legacy CCR Surface Impoundments*, 89 Fed. Reg. 38950 (May 8, 2024) (to be codified at 40 C.F.R. pts. 9, 257) ("2024 Legacy CCR Rule").

3.  I am General Counsel and Legal Director of Waterkeeper Alliance. I have held this position for over eight years, and I have worked in various capacities with and for the Waterkeeper movement for more than 30 years. My business address is 180 Maiden Lane, Suite 603, New York, New York 10038.

4.  In my role at Waterkeeper Alliance, I am responsible for supervising all of Waterkeeper Alliance's legal work, including all litigation to which Waterkeeper Alliance is a party.

5.  Waterkeeper Alliance is a not-for-profit membership corporation organized under the laws of the State of New York, and a charitable corporation under section 501(c)(3) of the Internal Revenue Code. We comprise a global movement uniting more than 300 community-based Waterkeeper groups around the world, focusing citizen action on issues that affect our waterways, from pollution to climate change. We collectively patrol and protect nearly six million square miles of rivers, lakes, and coastlines in the

Americas, Europe, Australia, Asia, and Africa. In the United States, the
Alliance represents the interests of approximately 150 U.S. Waterkeeper
member groups and their hundreds of thousands of individual members and
supporters that live, work, and recreate in or near waterways across the
country, many severely impaired by pollution from coal-fired power plants.

6.   Waterkeeper Alliance has interests in the matters addressed herein that are
aligned with the interests of these member groups and their individual
members. Every lawsuit that Waterkeeper Alliance brings or participates in
is to support the interests of and/or on behalf of Waterkeeper member
groups and their individual members.

7.   Potomac Riverkeeper Network is a Waterkeeper member group in good
standing. *See* the accompanying Declaration of Dean Naujoks, submitted
herewith in support of our Motion to Intervene.

8.   Waterkeeper Alliance's organizational model emphasizes grassroots
advocacy. To become a member of Waterkeeper Alliance, prospective
Waterkeeper groups must demonstrate that they will meet organizational
quality standards. Each Waterkeeper group is associated with a particular
body of water or watershed, which represents that group's "jurisdiction."
Waterkeeper groups seek to protect and preserve the quality of the water
resources within their respective jurisdictions by advocating for compliance

3

with state and federal environmental laws, responding to citizen complaints, identifying problems that negatively affect their waterbodies, and devising appropriate remedies to address those issues.

9. Waterkeeper Alliance advances its own interests and the interests of its member Waterkeeper groups and their individual members through a variety of means, including identifying noncompliance with federal and state environmental laws and regulations and bringing that noncompliance to the attention of regulatory authorities. Waterkeeper Alliance also brings litigation against polluters and government agencies on behalf of itself and its member Waterkeeper groups to enforce federal and state environmental laws and regulations when necessary to ensure compliance and to protect aquatic ecosystems and communities from pollution.

10. Through my educational and professional experience, I have gained extensive knowledge about a wide range of environmental topics. These topics include the harmful effects of pollution associated with coal extraction and combustion on aquatic ecosystems and human health.

11. Through my educational and professional experience, I have learned that coal ash – technically known as "coal combustion residuals" – contains extremely dangerous toxic substances such as mercury, arsenic, manganese, selenium, chromium, lead, and other toxic and carcinogenic

4

constituents and radioactive properties that are extremely harmful to human health and aquatic ecosystems.

12. To achieve its organizational mission of strengthening and growing a global network of grassroots leaders protecting everyone's right to clean water, Waterkeeper Alliance concentrates its work on certain issues that most strongly affect that mission, especially when an issue affects a large number of Waterkeeper groups and their members and communities. One such set of issues is pollution resulting from the extraction, transportation, combustion, and disposal of coal and its byproducts. Waterkeeper Alliance staff have worked with Waterkeeper groups and other partners for many years to investigate coal-related pollution sources and to implement strategies to abate such pollution. Federal laws such as the Clean Water Act and RCRA, and federal and state regulations implementing those laws, are primary tools that Waterkeeper Alliance and our member groups rely on to protect waterways and communities from coal ash pollution.

13. Waterkeeper Alliance and its member Waterkeeper groups have frequently participated in administrative processes before state and federal agencies, including EPA, concerning proposed rules and permits for coal-burning power plants, to urge those agencies to require responsible management of coal ash and protective discharge limits in discharge permits for coal-

burning power plants that are consistent with Clean Water Act requirements.

14. In addition, Waterkeeper Alliance and its member Waterkeeper groups have frequently participated in citizen enforcement suits under the Clean Water Act, including citizen suits against the owners or operators of coal mines and coal-burning power plants who violate federal environmental laws.

15. I am aware that many of the aquatic ecosystems and communities that Waterkeeper Alliance aspires to protect, including such waters and communities associated with particular Waterkeeper groups such as Potomac Riverkeeper Network, and many others, are adversely impacted by the longstanding lack of effective federal regulations to ensure that coal ash is managed and disposed of in a manner that avoids such adverse environmental and health impacts.

16. In the early 2010s, Waterkeeper Alliance worked with numerous NGO partners to urge EPA to promulgate federal regulations to require safe and effective management and disposal of coal ash at power plants. When EPA finalized its first CCR rule in 2015, Waterkeeper Alliance was one of the environmental organizations that challenged that rule, arguing that the agency had acted arbitrarily and capriciously and contrary to RCRA in

failing to require the closure of unlined surface impoundments, in classifying so-called "clay-lined" impoundments as lined, and in exempting inactive surface impoundments at inactive power plants from regulation. In 2018, this court granted our petition, vacating portions of that rule and remanding it to EPA to cure these defects. *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 404, 449 (D.C. Cir. 2018).

17. I am aware that earlier this year EPA adopted the 2024 Final Rule to address the defects we and our partners had challenged and that this court vacated. When EPA first proposed to update the CCR rule to address the defects the court had identified, Waterkeeper Alliance and partners submitted comments urging EPA to finalize the most protective rule possible consistent with RCRA requirements.

18. I understand that the new 2024 Legacy CCR Rule will require far safer and more responsible management of coal ash than the 2015 CCR rule did. For example, the 2024 Legacy CCR Rule includes safeguards for legacy CCR surface impoundments that were exempt from federal regulation under the 2015 rule that largely mirror those for inactive impoundments at active facilities. These include requiring the proper closure of the impoundments and remediating CCR-contaminated groundwater.

19.  In addition, EPA found "historic" disposal units that are leaking and contaminating groundwater at currently regulated power plants, but which were exempt under the original 2015 regulations. These are areas where coal ash was placed directly on the land, such as coal ash in surface impoundments and landfills that closed prior to the effective date of the 2015 CCR Rule, as well as inactive CCR landfills. The 2024 CCR Rule extends a subset of EPA's existing CCR requirements to these previously unregulated disposal units that will ensure that contamination from these areas is remediated which should prevent further environmental contamination.

20.  I am aware that City Utilities of Springfield, Missouri, filed a petition for review of the 2024 Legacy CCR Rule in this court. Based on the comments filed by these petitioners during the public comment period on the proposed rule, it appears that these petitioners' aim through this litigation will be to weaken or overturn the 2024 Legacy CCR Rule's new, more stringent requirements for coal ash management and disposal at power plants across the country.

21.  If industry challenges to the 2024 Legacy CCR Rule were to succeed, much or all the new safeguards required by the rule would be undone, and damaging water pollution from numerous coal-burning power plants would

8

continue in watersheds and communities throughout the United States. This continued damage to ecosystems and communities would harm the interests of Waterkeeper Alliance, many of our member Waterkeeper groups, and their individual members who live, work, and recreate in these watersheds and communities.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct. Executed this 8th day of July 2024, in New York, New York.

Daniel E. Estrin

9