ORAL ARGUMENT NOT YET SCHEDULED

No. 24-1200 (and consolidated cases)

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CITY UTILITIES OF SPRINGFIELD, MISSOURI
BY AND THROUGH THE BOARD OF PUBLIC UTILITIES,
*Petitioner,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents.*

_____

Petition for Review of Action of the
U.S. Environmental Protection Agency

_____

**RESPONDENTS' OPPOSITION TO
EAST KENTUCKY POWER COOPERATIVE'S
MOTION FOR A STAY PENDING REVIEW**

_____

TODD KIM
Assistant Attorney General

Of Counsel:

TSUKI HOSHIJIMA
DAVID D. MITCHELL
LAUREL CELESTE                Environment and Natural Resources
U.S. Environmental Protection   Division
 Agency                         U.S. Department of Justice
                                P.O. Box 7411
                                Washington, D.C. 20044
                                (202) 532-3285
                                tsuki.hoshijima@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION ..................................................................... 1

BACKGROUND ....................................................................... 3

I.    Statutory Background .................................................... 3

II.   Coal-Ash Regulation ..................................................... 3

STANDARD OF REVIEW ........................................................ 6

ARGUMENT .......................................................................... 7

I.    East Kentucky is unlikely to succeed on the merits. ...................... 7

    A.    EPA can regulate solid waste remaining at a facility even after the removal of coal ash. ........... 7

    B.    The Rule imposes prospective requirements with no impermissible retroactive effects. ................... 12

    C.    The Rule is not inconsistent with the WIIN Act ................. 15

    D.    Congress has authority under the Commerce Clause to regulate coal-ash disposal. ................... 17

    E.    East Kentucky's arbitrary-and-capricious arguments lack merit. ................................... 20

II.   East Kentucky has not shown irreparable harm ........................ 23

III.  A stay would harm the public interest. ................................ 25

CONCLUSION ...................................................................... 27

LIST OF EXHIBITS ............................................................... 30

**INTRODUCTION**

Burning coal to generate electricity results in coal combustion residuals ("coal ash"), which contain carcinogens and neurotoxins. Coal-fired power plants dispose of coal ash in large landfills and surface impoundments, which are often unlined and thus leak toxic contaminants into the soil and groundwater.

In the challenged Rule, the Environmental Protection Agency found that its pre-existing regulations have gaps and do not address certain types of known contamination from coal-ash disposal. 89 Fed. Reg. 38950, 38994 (May 8, 2024). The Rule newly addresses risks from those previously unregulated forms of coal-ash disposal. It does so consistent with the standard in the Resource Conservation and Recovery Act ("RCRA"), which requires regulations governing solid-waste disposal to ensure that there is no reasonable probability of harm to health or the environment.

East Kentucky Power Cooperative has not met its burden to justify the extraordinary remedy of a stay pending judicial review. East Kentucky argues that once it has removed coal ash from an impoundment, EPA lacks authority to regulate. But East Kentucky's

characterization of such a removal as a "clean" closure is misleading. Removing coal ash does not address contaminants that leached out of the impoundment into the soil or groundwater, and EPA has the authority to address harms from such leachate.

EPA exercised that authority reasonably through a tailored approach that gives East Kentucky a chance to show through groundwater monitoring that no further cleanup is necessary. But East Kentucky cannot rely solely on the fact that a state agency approved the closure of its impoundments because that approval addressed only the removal of coal ash, not harms from leachate. East Kentucky's assorted other merits arguments also lack merit.

East Kentucky's irreparable-harm assertions overstate its costs and mischaracterize the Rule's requirements. East Kentucky also fails to acknowledge the Rule's substantial public-health benefits, which outweigh any compliance costs it might incur during judicial review.

The motion should be denied.

# BACKGROUND

## I. Statutory Background

Subtitle D of RCRA prohibits the "open dumping" of solid waste. 42 U.S.C. § 6945(a). The statute directs EPA to establish criteria to determine what counts as open dumping. *Id.* §§ 6903(14), 6907(a)(3), 6944(a). Those criteria must ensure that there is "no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility." *Id.* § 6944(a).

In 2016, the Water Infrastructure Improvements for the Nation ("WIIN") Act amended RCRA to add provisions specific to coal ash. States may seek EPA's approval of a state coal-ash permitting program to operate "in lieu of" EPA's federal coal-ash criteria. *Id.* § 6945(d)(1)(A). The statute directed EPA to implement a permit program in States without approved programs. *Id.* § 6945(d)(2)(B). Absent a state or federal permit, facilities must continue to comply with the federal criteria. *Id.* § 6945(d)(3), (6).

## II. Coal-Ash Regulation

Coal ash results from burning coal to produce electricity. Ex.A 2-1 to 2-2. Coal ash contains toxic contaminants that cause harms such as

cardiovascular mortality, neurological harm, and various cancers. 89 Fed. Reg. at 38980, 39094-95. Coal plants dispose of coal ash in massive impoundments and landfills of many acres in size. *Id.* at 38985.

In 2015, EPA established national minimum criteria for the safe disposal of coal ash in landfills and surface impoundments. 80 Fed. Reg. 21302 (Apr. 17, 2015) ("2015 Rule"). EPA found that unlined landfills and impoundments leach contaminants at significant levels and that impoundments also present the risk of catastrophic structural failure. *Id.* at 21326-27. The 2015 Rule regulated new and existing impoundments, as well as certain inactive impoundments—impoundments that no longer receive coal ash after October 2015 but still contain coal ash and liquids after that date. *Id.* at 21342. The 2015 Rule exempted inactive impoundments at inactive facilities, known as legacy impoundments. *Id.* at 21344.

The D.C. Circuit upheld most of the 2015 Rule but vacated certain parts, including the exemption for legacy impoundments. *Util. Solid Waste Activities Grp. v. EPA* ("*USWAG*"), 901 F.3d 414 (D.C. Cir. 2018). The Court emphasized the record evidence that legacy impoundments pose at least as much risk, if not more, as impoundments that were

regulated by the 2015 Rule. *Id.* at 432-33. That is because legacy impoundments are generally unlined and unmonitored, thus posing a "unique confluence of risks." *Id.*

In the Rule challenged here, EPA responded to *USWAG* by establishing requirements for legacy impoundments. 89 Fed. Reg. at 38956. EPA found that legacy impoundments are more likely to have leaked than previously regulated impoundments. *Id.* at 39025. EPA determined that legacy impoundments are generally unlined, so EPA required them to close—like EPA did for previously regulated unlined impoundments. *Id.* at 39011, 39024-26. The Rule includes tailored provisions for legacy impoundments that have already taken steps toward closure. Impoundments that already meet federal closure requirements only need to document that fact, and impoundments that closed under previous regulatory oversight have a chance to show that the completed closure is as protective as federal closure requirements. *Id.* at 39009-10, 39030-31.

The Rule also addresses risks from other types of previously unregulated coal-ash disposal. *Id.* at 38956. The Rule does so by applying certain existing regulations to "CCR management units," which are

impoundments and landfills that closed before the effective date of the 2015 Rule, inactive landfills, and other areas where coal ash is managed directly on the land. *Id.*

## STANDARD OF REVIEW

East Kentucky bears the burden to justify the "extraordinary remedy" of a stay. *Cuomo v. NRC*, 772 F.2d 972, 978 (D.C. Cir. 1985). It must show: a likelihood of success on the merits; irreparable injury absent a stay; lack of harm to others from a stay; and that a stay would serve the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The third and fourth factors merge here. *Id.* at 435. Because a stay is an "intrusion into the ordinary processes of administration and judicial review," a stay "is not a matter of right, even if irreparable injury might otherwise result." *Id.* at 427.

On the merits, review is limited to the administrative record under an arbitrary-and-capricious standard. 5 U.S.C. § 706(2)(A). That standard "mandate[s] that judicial review of agency policymaking and factfinding be deferential." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024).

# ARGUMENT

## I. East Kentucky is unlikely to succeed on the merits.

### A. EPA can regulate solid waste remaining at a facility even after the removal of coal ash.

East Kentucky's primary challenge is to the Rule's regulation of a particular subset of legacy impoundments: those from which coal ash has been removed. Mot. 10-14. East Kentucky argues that such an impoundment, like those at its Dale Station, is no longer a "facility or site where solid waste is disposed of." 42 U.S.C. § 6903(14). Thus, it says, EPA lacks authority to regulate.

EPA has authority over facilities where solid waste is present. 42 U.S.C. §§ 6903(14), 6944(a); 89 Fed. Reg. at 38996; *USWAG*, 901 F.3d at 440-41; 40 C.F.R. § 257.53 (defining "facility" more broadly than an impoundment itself). East Kentucky makes an unsupported claim that its facility became free of solid waste once it removed coal ash from its impoundments. In fact, the record shows that when rainwater or groundwater percolates through coal ash, the result is leachate that contains suspended components drawn from the coal ash. 89 Fed. Reg. at 38996 & n.54. Removal of all coal ash prevents an impoundment from creating more leachate, but it does not address leachate that has already

contaminated the soil and groundwater. *Id.* at 38975, 38984, 38997.

Leachate itself is a solid waste under RCRA's broad definition because it

is a "discarded material." *Id.* at 38997 (citing 42 U.S.C. § 6903(27)); *Am.*

*Min. Cong. v. EPA*, 824 F.2d 1177, 1185 (D.C. Cir. 1987).[1] RCRA's

definition of disposal expressly includes "leaking" of solid waste such as

leachate. 42 U.S.C. § 6903(3); 89 Fed Reg. at 38997; 80 Fed. Reg. at

21342-47; *In re Consol. Land Disposal Regul. Litig.*, 938 F.2d 1386, 1389

(D.C. Cir. 1991); *Chem. Waste Mgmt., Inc. v. EPA*, 869 F.2d 1526, 1539

(D.C. Cir. 1989); *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*,

989 F.2d 1305, 1314 (2d Cir. 1993). EPA has authority to regulate

leachate that remains at the facility. *See USWAG*, 901 F.3d at 439-41.

The technical and factual record amply supports EPA's conclusion

that solid waste, in the form of leachate-contaminated soils and

groundwater, is expected to remain at sites like East Kentucky's Dale

Station. 89 Fed. Reg. at 38997-98. Unlined impoundments leak.[2] Water

---

[1] RCRA's definition of solid waste includes "solid, liquid, [and] semisolid… material resulting from industrial… operations." 42 U.S.C. § 6903(27). It excludes certain "solid or dissolved material," but none of those exclusions applies here. *See id.*

[2] EPA has acknowledged the theoretical possibility that naturally occurring (e.g., clay) soil surrounding an impoundment is so dense and uniform that any leachate would not migrate far from the unit. *See* 85

that is ponded above coal ash creates a large and sustained pressure that drives leachate into the ground beneath the impoundment. *Id.* at 38958. Even without ponded water, free liquids saturating the coal ash in an impoundment eventually leak out into the surrounding soil or into the aquifer, along with any coal-ash constituents that have leached from the waste in the interim. *Id.* at 38983.

EPA's 2014 risk assessment showed that impoundments generally, and unlined impoundments especially, leak contaminants at levels that pose health and environmental risks and warrant regulation. *Id.* at 38974; Ex.B ES-7. In this Rule, EPA concluded that its 2014 risk assessment was "equally applicable" to legacy impoundments. 89 Fed. Reg. at 38958, 38975. That is because legacy impoundments are similarly constructed, manage the same types of ash, and are often located at the same or nearby facilities as the impoundments that EPA analyzed in 2014. *Id.* at 38975.

In fact, EPA found that legacy impoundments may leak even more than EPA found in the 2014 risk assessment. Legacy impoundments are

Fed. Reg. 72506, 72509 (Nov. 12, 2020). But no facility has ever been able to demonstrate that such conditions actually exist at its impoundment. https://www.epa.gov/coalash/coal-combustion-residuals-ccr-part-b-implementation#review (proposed denials of such showings).

generally unlined. No commenter identified a lined legacy impoundment, 89 Fed. Reg. at 39011, and East Kentucky does not claim that any of its impoundments were lined, *see* Mot.Ex.1. Unlined impoundments leak more than the lined impoundments that EPA assessed in 2014. 89 Fed. Reg. at 38975-76; Ex.A 3-2 to 3-3. Legacy impoundments are also more likely to have contained a combination of coal ash and other wastes with increased acidity, resulting in a higher concentration of contaminants in the leachate. 89 Fed. Reg. at 38975-76. Because legacy impoundments tend to be older, they also have had more time to leak. *Id.* Finally, EPA's 2014 risk assessment did not account for the disposal of coal ash below the water table. More recent information shows that this disposal practice, which creates more leachate with potentially higher concentrations of contaminants, was more common than EPA understood in 2014. *Id.* at 38976-77. EPA thus concluded that leakage from legacy impoundments presents significant risks to health and the environment. *Id.* at 38977-80; Ex.A 7-7 to 7-8.

The record shows that removal of coal ash is unlikely to address contaminants that leaked into the soil and that it does not address groundwater contamination. East Kentucky says that it removed coal

ash from its impoundments based on visual inspection, Mot.Ex.1 ¶18(b), but EPA found that such removal is not designed to, and is unlikely to, address all soil affected by leachate, 89 Fed. Reg. at 38998. And East Kentucky does not claim to have done anything to ensure that no leachate remained in the groundwater. Mot.Ex.1 ¶¶18–19. East Kentucky's characterization of its closure as a "clean" one, Mot. 7, is misleading.

EPA did not assert regulatory authority over any site where the owner or operator has shown that both coal ash and leachate have been removed, leaving no harmful solid waste. A site that shows compliance with the closure requirements in 40 C.F.R. § 257.102(c) is thus subject to no other requirements under this Rule. 89 Fed. Reg. at 38998. But without such a showing, EPA found, based on its extensive technical and factual record, that leachate would normally remain. *Id.* at 38996-98, 39020 (summarizing "totality of this record").

EPA found that a State's oversight of closure efforts does not necessarily ensure that leachate contamination has been addressed. EPA reviewed state programs regulating coal ash and found a wide range of protectiveness, with clear deficiencies in some programs. *Id.* at 38984, 39029-30 (identifying Kentucky as an example of a State that has

authorized "closures that are significantly less protective than" federal closure standards); 80 Fed. Reg. at 21324-25. Compliance with state requirements does not ensure "no reasonable probability of adverse effects on health or the environment," as RCRA requires. 42 U.S.C. § 6944(a).

In sum, EPA has not rewritten RCRA to allow regulation based on the past presence of solid waste. Mot. 13. Instead, EPA exercised its authority to regulate currently present solid waste at sites like East Kentucky's Dale Station.

## B. The Rule imposes prospective requirements with no impermissible retroactive effects.

Because the factual record shows the continued presence of solid waste even after removal of coal ash, and the Rule imposes prospective requirements, the Rule is not impermissibly retroactive. EPA adequately considered reliance interests anyway.

Primary retroactivity is when a regulation changes the past legal consequences of past conduct. *Bergerco Canada v. U.S. Treasury Dep't*, 129 F.3d 189, 192 (D.C. Cir. 1997). Secondary retroactivity is when a regulation has future effect but in a way that affects past investments

made in reliance on past rules. *Id.* Secondary retroactivity is common, and it is permissible so long as a rule is not arbitrary or capricious. *Id.*

The Rule has no primary retroactive effect because it imposes only future requirements with future compliance dates. 89 Fed. Reg. at 38985. East Kentucky is wrong that the Rule attaches new legal consequences to its completed action of removing coal ash under state supervision. Mot. 16. Rather, the Rule regulates prospectively based on the current presence of solid waste that "is disposed of." *Supra* Section I.A; *USWAG*, 901 F.3d at 441. Nor does the Rule increase East Kentucky's liability for past conduct by classifying legacy impoundments based on whether they contained coal ash and liquid after October 2015. The Rule "merely rel[ies] on a past fact to support the future application of regulations" to address current and future risks from current conditions. 89 Fed. Reg. at 38985. That is permissible. A requirement "is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment." *Ass'n of Accredited Cosmetology Sch. v. Alexander*, 979 F.2d 859, 865 (D.C. Cir. 1992) (quoting *Reynolds v. United States*, 292 U.S. 443, 449 (1934)).

EPA adequately considered any secondary retroactive effects. 89 Fed. Reg. at 38985. EPA recognized that some facilities have closed legacy impoundments under state-law requirements. *Id.* But because many of those state laws do not meet RCRA's requirement of ensuring "no reasonable probability of adverse effects on health or the environment," 42 U.S.C. § 6944(a), EPA had no basis to exempt all impoundments that had closed under state-law requirements, 89 Fed. Reg. at 38985. Instead, EPA accounted for such reliance through tailored provisions for facilities that have undergone some form of closure. *Id.* A facility that can show that its impoundments met the federal closure requirements does not have to do anything more. *Id.*; *id.* at 39009-10, 39107-08 (40 C.F.R. § 257.100(g), (h)(1)). Even if a facility cannot make that showing, an impoundment that closed under a regulatory authority's oversight and meets certain requirements can defer compliance with federal closure requirements pending a site-specific evaluation of whether the closure is as protective as federal closure requirements. *Id.* at 38985-86, 39025, 39030-31, 39109 (40 C.F.R. § 257.101(g)).

Put simply, if East Kentucky is correct that its closure at Dale Station was "clean," in that there is no remaining coal-ash or leachate contamination, then all it needs to do is to show that. If it does, the Rule does not require it to do anything more.

## C. The Rule is not inconsistent with the WIIN Act

East Kentucky argues that the Rule is unlawful because the WIIN Act prohibits EPA from promulgating new criteria for the disposal of coal ash by regulation. Mot. 17-19. That is wrong because, even after the WIIN Act amendments, RCRA still requires EPA to establish solid-waste-disposal criteria by regulation. 42 U.S.C. §§ 6907(a)(3), 6944(a); *see also* 89 Fed. Reg. at 39027 (explaining that the WIIN Act "added a permitting component but retained without revision" EPA's authority to establish national criteria by regulation). The WIIN Act expressly stated that it did not intend to affect any existing EPA authority. 42 U.S.C. § 6945(d)(7).

The purpose of permit programs under the WIIN Act is to enforce EPA's regulations for the safe disposal of coal ash. *See* 42 U.S.C. § 6945(d)(2)(B), (d)(6). The WIIN Act directs EPA to establish a coal-ash permit program "to achieve compliance with [EPA's regulations]." 42

U.S.C. § 6945(d)(2)(B). States can operate their own coal-ash permit programs, but only if state standards are "at least as protective" as EPA's regulations. *Id.* § 6945(d)(1)(A)-(C); *USWAG*, 901 F.3d at 426. The existence of a permit program does not obviate the need for the nationwide regulations. *Cf. Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 211 (2007) (explaining RCRA Subtitle C, under which EPA establishes national standards and permit programs ensure compliance).

East Kentucky tries to rewrite RCRA's statutory text. It claims that the WIIN Act reduces EPA's regulations to "gap filler[s]" that operate on an "interim basis" only until a permitting program can be established. Mot. 17-18. This language is not in RCRA, whereas the statutory mandate that EPA promulgate regulations is. 42 U.S.C. § 6944(a).

East Kentucky argues that Congress's reference to "successor" regulations in the WIIN Act freezes EPA's authority "within the same bounds as the 2015 Rule." Mot. 18. The 2015 Rule cannot be frozen in place, since this Court held in *USWAG* that the 2015 Rule's exemption for legacy impoundments was unlawful. 901 F.3d at 432-34. This Rule, which responds to that decision, is a "successor" regulation within the ordinary meaning of the word because it follows the 2015 Rule. *See*

Webster's New World College Dictionary 1429 (Michael Agnes & David B. Guralnik eds., 4th ed. 2009) (defining "successor" as "thing that succeeds, or follows, another"). The WIIN Act does not preclude EPA from modifying or expanding its criteria for the safe disposal of coal ash to meet the "no reasonable probability" protectiveness standard. 42 U.S.C. § 6944(a); 89 Fed. Reg. at 39046. On the contrary, Congress expressly contemplated in the WIIN Act that EPA may "revise[]" the criteria. 42 U.S.C. § 6945(d)(1)(D)(ii); *id.* § 6945(d)(7) (preserving existing EPA authorities).

### D. Congress has authority under the Commerce Clause to regulate coal-ash disposal.

East Kentucky is wrong that RCRA—and thus the regulation of impoundments under the Rule—exceeds Congress's authority under the Commerce Clause. Congress can regulate activities "that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005). That authority is not only limited to activities that themselves that have substantial effects, but it also extends to activities with substantial effects when aggregated with similar activities by others. *Id.* (citing *Wickard v. Filmore*, 317 U.S. 111, 127-28 (1942)). Congressional enactments are presumptively constitutional, *United*

*States v. Morrison*, 529 U.S. 598, 607 (2000), and must be upheld if there is a "rational basis" for Congress's conclusion "that a regulated activity substantially affects interstate commerce," *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 180 (2015) (citing *Hodel v. Indiana*, 452 U.S. 314, 323-24 (1981)).

In RCRA, Congress made express findings that solid waste results from national economic activity, that solid waste disposal is a problem "national in scope," and that open dumping results in health and environmental harms. 42 U.S.C. § 6901. Coal ash results from burning coal to produce electricity, which substantially affects interstate commerce. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267-75 (2016) (discussing interstate nature of electric grid). The Rule also addresses significant threats to public health from the open dumping of coal ash. *See, e.g.*, 89 Fed. Reg. at 38956-57.

These effects provide a rational basis to uphold RCRA—and, thus, the Rule. Courts have long held that the Commerce Clause authorizes regulation of "activities causing air or water pollution, or other environmental hazards that may have effects in more than one State." *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 83 (D.C. Cir. 2000)

(citing *Hodel v. Va. Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 282, (1981)). The electricity whose generation produces the waste also contributes to interstate economic activity. *See Miss. Comm'n,* 790 F.3d at 181; *Allied Local*, 215 F.3d at 83.

East Kentucky has the burden to prove otherwise. *Miss. Comm'n*, 790 F.3d at 182 (citing *Morrison*, 529 U.S. at 607). East Kentucky does not meet that burden merely by arguing that RCRA regulates land, which is stationary. Mot. 20. There is no principle that regulation under Commerce Clause authority may not affect a piece of land within a single State. *See Hodel*, 452 U.S. at 281-82. In any event, RCRA Subtitle D regulates the management and disposal of solid waste, not land, and Congress can regulate solid waste disposal for the reasons above.

East Kentucky protests that the Dale Station impoundments were "a wholly intra-state matter." Mot. 19-21. Even if true, that would have no constitutional consequence: "where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Miss. Comm'n*, 790 F.3d at 182 (quoting *United States v. Lopez*, 514 U.S. 549, 558 (1995)). RCRA and the Rule are constitutional.

### E. East Kentucky's arbitrary-and-capricious arguments lack merit.

East Kentucky's final attempt to show a likelihood of success on the merits, through four arbitrary-and-capricious arguments, is unavailing. Mot. 21-23.

*First*, EPA adequately considered past investments. If East Kentucky can show that its prior closure was indeed clean, then it does not have to do anything more. *Supra* Section I.B. The Rule does not require unnecessary repetition of past work. Anyway, it is untrue that the Rule would "duplicate" the costs that East Kentucky has already incurred. Mot. 21. East Kentucky says its past work was to remove coal ash. The Rule does not require it to re-remove coal ash that is already gone. What the Rule does require is groundwater monitoring. That is not a duplicative requirement because East Kentucky acknowledges that it has done no such monitoring. Mot.Ex.1 ¶ 19.

East Kentucky reiterates that a Kentucky state agency approved its closure. Mot. 21. But a State's oversight of past closure efforts does not guarantee that all risks have been properly addressed, since EPA found many States' oversight efforts, including Kentucky's, to be inadequate. 89 Fed. Reg. at 38984, 39029-30. Given that finding, it was

not arbitrary or capricious for EPA to reject "a broad exemption for all closures under any State requirement." *Id.* at 39029. And East Kentucky admits that the State's approval of its coal-ash removal did not require any remediation, or even monitoring, of the groundwater. *Supra* Section I.A.

*Second*, EPA's risk assessment showed that legacy impoundments as a class pose a reasonable probability of harm. That is enough to support the nationwide regulation; EPA was not required to show "evidence that the former impoundments at the Dale Station," specifically, pose the risk of harm. Mot. 22; *see USWAG*, 901 F.3d at 427 (rejecting argument that EPA must show that all members of the regulated category of impoundments are leaking). A State's approval of prior closure efforts does not negate that conclusion, since not all state oversight ensures adequate protectiveness. *Supra* Section I.A.

As to Dale Station specifically, a Kentucky state agency's approval did not "confirm[]" the absence of contaminated soil and groundwater. Mot. 22. That approval depended only on a visual inspection of the soil immediately beneath the impoundment, with no sampling of soil or

groundwater, Mot.Ex.1 ¶ 18(b), which EPA found would not address contaminated soil and groundwater, 89 Fed. Reg. at 38998.

*Third*, East Kentucky's argument on the WIIN Act recycles its prior argument. *Compare* Mot. 17-19, *with* Mot. 22-23. RCRA requires EPA to promulgate criteria for coal-ash disposal by regulation, and the WIIN Act did not negate EPA's authority to do so. *Supra* Section I.C. EPA's action was thoroughly explained and lawful. *See* 89 Fed. Reg. at 39027 (explaining why EPA was not taking a solely site-specific approach).

*Fourth*, EPA explained that regulating legacy impoundments based on whether they contained coal ash and liquids after October 2015— rather than whether they currently contain coal ash and liquids—is supported by the factual record and RCRA's protectiveness standard. 89 Fed. Reg. at 38982-84. EPA did allow a different approach where available information does not allow a determination of whether an impoundment contained both coal ash and liquid after October 2015. 89 Fed. Reg. at 39007, 39106. In that case, the impoundment owner or operator must certify the lack of available information and conduct a field investigation to determine whether the impoundment currently contains coal ash and liquids. *Id.* While EPA reasonably decided not to penalize

those owners and operators for their recordkeeping practices before the effective date of this Rule, EPA also reasonably decided not to extend that approach where available records show that an impoundment contained coal ash and liquids after October 2015.

## II. East Kentucky has not shown irreparable harm.

East Kentucky's inflated and unsupported estimate of compliance costs does not justify a stay. East Kentucky asserts that compliance will cost $16.5 million. Mot. 26 (citing Mot.Ex.1 ¶36). But East Kentucky provides no documentation or other support for that number, and it does not state what actions are encompassed within that estimate. The estimate also lacks credibility because East Kentucky's estimate keeps changing. *See* Mot.Ex.2 at 18 (asserting compliance costs of $6.925 million in East Kentucky's August 2024 administrative stay request).

East Kentucky's estimate also conflicts with EPA's record-supported estimate that groundwater monitoring will on average cost only $229,000 per impoundment. Ex.C 4-23 to 4-24. The best explanation for the discrepancy is that East Kentucky's $16.5 million cost estimate assumes—contrary to its merits arguments—that groundwater contamination at Dale Station will be found and need to be remedied.

(EPA's cost estimate for corrective action, which is required only if groundwater monitoring shows contamination, is $22 million. *Id.*)

If East Kentucky is correct that its closure was truly "clean," then it would only incur the limited cost of groundwater monitoring—a small fraction of the costs that it asserts. East Kentucky would not be forced to "re-close" any impoundments.[3] Mot. 26. Such limited costs do not justify a stay. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("[O]rdinary compliance costs are typically insufficient to constitute irreparable harm."). East Kentucky is also wrong that it would have to permanently alter real property. Mot. 27. The Rule does not require permanent groundwater monitoring, so any installation of groundwater monitoring wells would be temporary. *See* 89 Fed. Reg. 39105-06.

Finally, "the deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely," *Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 334 (D.C. Cir.

---

[3] East Kentucky says it is "impossible" for it to show compliance with groundwater protection standards by November 2024. Mot. 25. But as East Kentucky acknowledges, *id.*, if it can show by May 2028 that groundwater standards are met, then it needs to do nothing more, 89 Fed. Reg. at 39009-10, 39107-08.

2018), and East Kentucky's constitutional arguments are meritless as explained above.

## III. A stay would harm the public interest.

In *USWAG*, this Court found that it was arbitrary and capricious to exempt legacy impoundments from regulation, and those are the very units this Rule regulates. 901 F.3d at 432-34. Yet East Kentucky requests that the Rule be delayed further. Mot. 9. The equities are not close.

The benefits of the Rule are significant, including prevention of catastrophic impoundment failure, fewer cases of cancer, avoided IQ losses, and cleaner surface waters. *See* 89 Fed. Reg. at 39094-95. EPA found many of the Rule's benefits to be unquantifiable, including various benefits known to be significant, but still estimated the monetizable benefits to total $53-80 million per year. *See id.* at 39094. East Kentucky's unsupported assertion that the Rule "provides no environmental benefit" is simply untrue. Mot. 27.

East Kentucky would delay the benefits that Congress sought to achieve nationally by regulating the solid-waste disposal through RCRA, and harms to the public during that period of delay may be irreversible. *See* 42 U.S.C. §§ 6902, 6944, 6945. East Kentucky would do so based on

inflated compliance costs that it may or may not incur at a single site. Mot. 27-28. That would be inequitable, particularly where Congress did not direct EPA to consider costs when addressing harms from solid-waste disposal. *USWAG*, 901 F.3d at 448-49 (citing 42 U.S.C. § 6944(a)); *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) ("[A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation.").

East Kentucky claims that the Rule would increase consumer energy costs, but it provides no supporting evidence. Mot. 27. On the contrary, EPA estimated that the Rule may increase energy prices nationally by only a small fraction of one percent. Ex.C 6-8 to 6-9. East Kentucky suggests that its customers are in low-income communities and cannot afford any price hike at all. Mot. 27. But East Kentucky ignores that legacy impoundments are often located near low-income and vulnerable communities, such that the Rule is likely to benefit persons in those communities. 89 Fed. Reg. at 38951; Ex.C 6-19 to 6-47.

Finally, East Kentucky's argument that the government may not act unlawfully even in furtherance of the public interest, Mot. 27-28, assumes its success on the merits and eliminates the public interest as

an independent factor for a stay. Full consideration of the balance of equities shows that a stay is unwarranted.

* * *

A stay should be denied for the above reasons. If this Court finds that any relief is warranted, then such relief should be limited to parts of the Rule for which the Court finds the required showings to have been made—and further limited to sites where East Kentucky has shown irreparable harm. *See* 89 Fed. Reg. at 38951-52 (Rule's provisions can operate independently and are severable). For instance, if the Court were to find that East Kentucky met the stay factors only as to legacy impoundments where all coal ash has now been removed, then a stay should not extend to the Rule's requirements for CCR management units or the requirements for legacy impoundments as applied to impoundments that still contain coal ash.

## CONCLUSION

The motion should be denied.

Respectfully submitted,

/s/ *Tsuki Hoshijima*
TODD KIM
Assistant Attorney General

Of Counsel:

LAUREL CELESTE
U.S. Environmental Protection
 Agency

TSUKI HOSHIJIMA
DAVID D. MITCHELL
Environment and Natural Resources
 Division
U.S. Department of Justice

**CERTIFICATE OF COMPLIANCE**

This document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2) because, excluding the parts of the document exempted by Rule 32(f), it contains 5,194 words. This document complies with the typeface and type-style requirements of Rule 32(a)(5) and (6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Century Schoolbook fourteen-point font.

_/s/ Tsuki Hoshijima_

## LIST OF EXHIBITS

Exhibit A      EPA, Risk Assessment of Coal Combustion Residuals: Legacy Impoundments and CCR Management Units (Apr. 2024), EPA-HQ-OLEM-2020-0107-1065

Exhibit B      EPA, Human and Ecological Risk Assessment of Coal Combustion Residuals (Dec. 2014), EPA-HQ-OLEM-2020-0107-0885 (excerpt)

Exhibit C      EPA, Regulatory Impact Analysis, Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals from Electric Utilities; Legacy CCR Surface Impoundments (Apr. 2024), EPA-HQ-OLEM-2020-0107-1067